Cindy M. USICK, Plaintiff–Appellant,

v.

AMERICAN FAMILY MUTUAL INSUR-ANCE COMPANY, a Wisconsin corporation, Defendant–Appellee.

No. 04CA1943.

Colorado Court of Appeals, Div. A.

Jan. 26, 2006.

McDermott, Hansen & McLaughlin, LLP, William J. Hansen, Denver, Colorado, for Plaintiff–Appellant.

Harris, Karstaedt, Jamison and Powers, P.C., Robert W. Harris, A. Peter Gregory, Englewood, Colorado, for Defendant–Appellee.

DAVIDSON, Chief Judge.

In this health insurance coverage action concerning exclusions for preexisting conditions in individual health insurance policies, plaintiff, Cindy M. Usick, appeals from the trial court's summary judgment in favor of defendant, American Family Mutual Insurance Company. We affirm.

In March 1995, Usick purchased an individual health insurance policy issued by American Family. During the application process, Usick disclosed that she had a history of endometriosis. The form policy subsequently issued to Usick contained a general

provision providing coverage for preexisting conditions after twelve months, but also stated, "This provision does not apply if the sickness or physical condition is explicitly excluded in writing from coverage under the policy." The Declarations Page of her policy excluded treatments for "endometriosis or complications" for a minimum period of twenty-four months, only to be removed upon a written request by Usick and approval by American Family. Usick never requested its removal, nor did American Family remove it on its own. Usick timely paid her premiums, and the policy was annually renewed.

Beginning in 2002, Usick underwent additional treatment and surgeries relating to endometriosis. American Family repeatedly denied coverage for these claims, citing the exclusion in Usick's policy. Usick subsequently filed suit both in her individual capacity and on behalf of a class of similarly situated policyholders, claiming that her policy's exclusion contravened the plain language of § 10–16–118(I)(a)(II), C.R.S.2005, which limits preexisting condition exclusions. Alternatively, Usick claimed that her particular exclusion was ambiguous and therefore should be construed against American Family, as its drafter.

On cross-motions for summary judgment, the trial court ruled in favor of American Family. The court reasoned that the dispositive issue was whether the General Assembly intended for § 10–16–118(1)(a)(II) to limit insurers' ability to exclude specifically described preexisting conditions, like Usick's exclusion for "endometriosis or complications," or to limit only their ability to exclude "preexisting conditions" as a general category. The court found that § 10–16–118(1)(a)(II) was ambiguous as to this question, looked to other statutory provisions for guidance, and then concluded that § 10–16–118(1)(a)(II) was meant only to limit an insurer's ability to exclude coverage for "preexisting conditions" as a general category. Thus, according to the trial court, § 10–16–118(1)(a)(II) leaves insurers free to permanently exclude from coverage in individual policies preexisting conditions that are specifically described. The court further

concluded that the policy was not ambiguous. We agree.

I.   Meaning of § 10–16–118(1)(a)(II)

Section 10–16–118(1)(a)(II) provides:

A health coverage plan that covers residents of this state:

. . . .

(II) If it is an individual health benefit plan, or a group health coverage plan to which subparagraph (I) of this paragraph (a) does not apply, shall not deny, exclude, or limit benefits for a covered individual because of a preexisting condition for losses incurred more than twelve months following the effective date of coverage and may not define a preexisting condition more restrictively than an injury, sickness, or pregnancy for which a person incurred charges, received medical treatment, consulted a health care professional, or took prescription drugs within twelve months.

■   Usick's primary argument in the trial court, and continued here, is that the statute plainly and unambiguously proscribes the exclusion of a particular preexisting condition, such as her endometriosis, after twelve months following the effective date of her policy. We disagree.

As did the trial court, we find this section to be ambiguous. Although it unequivocally prohibits issuers of individual health benefit plans from denying, excluding, or limiting coverage of a preexisting condition for more than twelve months after the policy's effective date, the second phrase leaves ambiguous what is meant by a preexisting condition. It states that an insurer may not define a preexisting condition more restrictively than an injury, sickness, or pregnancy for which a person incurred charges, received medical treatment, consulted a health care professional, or took prescription drugs within the preceding twelve months. However, depending on which words one emphasizes when reading the second phrase, a preexisting condition could refer to two wholly different concepts under the statute.

On the one hand, with focus on the generic words "preexisting condition," the second phrase can be read as applying to the gener-

al category of exclusions in policies for "preexisting conditions." Under this reading, insurers could also exclude from coverage any medical condition, preexisting or not, if specifically described at the outset of the policy. This is so because those specifically described conditions would not then fall under the general category of exclusions for all "preexisting conditions" identified by treatment within a certain time preceding issuance of the policy, and would not be subject to the "twelve months following" limitation on exclusion from coverage. *Cf. O'Donnell v. Blue Cross Blue Shield*, 76 P.3d 308, 313 (Wyo.2003) (concluding that a waiver of coverage for a preexisting spine condition was not subject to the standard clause relating to coverage of "preexisting conditions").

On the other hand, with focus on the words "twelve months," all preexisting conditions could depend only on when the policyholder received treatment for the condition. Under this reading, even specifically described conditions would constitute a preexisting condition if treatment had been received within the preceding twelve months, and thus be subject to the "twelve months following" limitation on exclusions from coverage. This is the interpretation argued by Usick. It finds additional support by the use of the article "a" before "preexisting condition" because the article suggests that the statute was not intended to apply only to the general category of exclusions found in policies under "preexisting conditions."

To resolve this ambiguity, the trial court looked to another provision in the statutory scheme, § 10–16–202(3)(b), C.R.S.2005. The court concluded that the reference in § 10–16–202(3)(b) to "condition[s] not excluded from coverage by name or a specific description" reflected a legislative intent that § 10–16–118(1)(a)(II) was not meant to apply to such specifically described conditions. The trial court relied on the language in § 10–16–202(3)(b), which provides, in pertinent part:

> [N]o claim for loss incurred ... commencing after one year from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition *not excluded from coverage by name or a specific description* effective on the date of loss had existed prior to the effective date of coverage of this policy.
>
> (An individual health benefit plan shall not define a preexisting condition more restrictively than an injury, sickness, or pregnancy for which a person [was treated] within the twelve months immediately preceding the effective date of coverage.)

(Emphasis added.)

We agree that § 10–16–202(3)(b) supports the court's interpretation of § 10–16–118(1)(a)(II). The reference to conditions "not excluded from coverage by name or a specific description" suggests that the General Assembly presumed such conditions could also be excluded from coverage, without regard to the "after twelve months" limitation. Thus, the provision reflects a distinction between preexisting conditions and a specific condition that is otherwise excluded in an individual health plan.

Usick points out, however, that § 10–16–202(3)(b) applies not just to "health coverage plans," to which § 10–16–118 specifically applies, but to all "sickness" and "accident policies." *Compare* § 10–16–118(1), C.R.S.2005 (applying only to "a health coverage plan"), *with* § 10–16–202, C.R.S.2005 (contained in part 2 of title 16, governing "Sickness and Accident Insurance"). Furthermore, by definition, a health coverage plan is a subset of the broader category of sickness and accident policies. *See* § 10–16–102(22.5), C.R.S. 2005 (a "health coverage plan" is "a policy, contract, certificate, or agreement entered into by, offered to, or issued by a carrier to provide, deliver, arrange for, pay for, or reimburse any of the costs of health care services"); § 10–16–102(30), C.R.S.2005 (a "policy of sickness and accident insurance" is "any policy or contract of insurance against loss or expense resulting from the sickness of the insured or from the bodily injury or death of the insured by accident, or both").

Thus, as Usick asserts, a "policy of sickness and accident insurance" could include income replacement, mortgage protection, disability, and other insurance benefits that extend beyond the more narrow benefits payable under a "health coverage plan." Therefore, although the language in § 10–16–202(3)(b) supports the trial court's analysis,

Usick argues that § 10–16–202(3)(b), last amended in 1995, would be superseded on this specific point if § 10–16–118(1)(a)(II), as amended in 1997, were, as Usick contends that it is, to the contrary. *See* § 2–4–206, C.R.S.2005 (if statutes are irreconcilable, the statute prevails which is the later in its effective date).

However, the General Assembly originally enacted the provisions of § 10–16–118 as part of a comprehensive package of health care reforms in 1994 known as the Colorado Health Care Coverage Act. The act became the new article 16, titled Health Care Coverage. *See* § 10–16–101, et seq., C.R.S.2005. A review of the historical development of § 10–16–118(1)(a)(II) reveals that, for individual policies, the General Assembly has not changed the definition of "preexisting conditions" since it was added in 1994. Hence, § 10–16–202(3)(b) is the later enacted statute.

Moreover, analysis of this legislative history further supports the trial court's interpretation of the statute allowing, for individual policies, the permanent exclusion of specifically described conditions. *See Frank M. Hall & Co. v. Newsom,* 125 P.3d 444 (Colo. 2005) (considering statutory scheme as a whole as well as its historical development); *Carlson v. Ferris,* 85 P.3d 504, 508 (Colo. 2003) (examining entire legislative scheme to determine meaning of individual provisions).

As originally enacted in 1994, the Health Care Coverage Act contained a provision governing exclusions for preexisting conditions. This provision, Colo. Sess. Laws 1994, ch. 311, § 10–16–118(1)(a)(I) at 1915, as then in effect, read:

(1) A health benefit plan that covers residents of this state shall:

(a)(I) Not deny, exclude, or limit benefits for a covered individual because of a preexisting condition for losses incurred more than six months following the effective date of such individual's coverage. A health benefit plan shall not define a preexisting condition more restrictively than an injury, sickness, or pregnancy for which a person incurred charges, received medical treatment, consulted a health care professional, or took prescription drugs

within six months immediately preceding the effective date of coverage; except that an individual health benefit plan may extend the exclusion of a preexisting condition for a period not to exceed twelve months and may not define the preexisting condition more restrictively than an injury, sickness, or pregnancy for which a person incurred charges, received medical treatment, consulted a health care professional, or took prescription drugs within twelve months.

The 1994 version of § 10–16–118(1)(a)(I) applied to all health plans, group and individual, and contained the same ambiguity present in the current § 10–16–118(a)(II).

In 1997, however, the General Assembly amended several provisions of the 1994 Act, including § 10–16–118(1)(a)(I), to comply with then recently enacted federal legislation known as the Health Insurance Portability and Accountability Act of 1996 (HIPAA). *See* Colo. Div. Ins. Reg. 4–2–18 (1997). HIPAA mandated reforms regarding health insurance access, portability, renewability, mandatory coverage, and important here, preexisting condition exclusions. *See* 42 U.S.C. § 300gg, et seq. (2005); 29 U.S.C. § 1181, et seq. (2005). HIPAA's reforms largely targeted group health insurance plans, *see* John R. Paddock, Jr., 16 Colo. Practice Series, Employment Law & Practice—*Continuation of Benefits* § 11.23 (2d ed.2005), and also contained reforms applicable to "eligible" persons with prior group coverage who sought individual coverage, *see* 42 U.S.C. § 300gg.

With respect to preexisting condition exclusions, for group plans, HIPAA barred insurers from imposing exclusions for preexisting conditions that would last more than twelve months after the effective date of the policy. 42 U.S.C. § 300gg. For individual plans provided to statutorily defined "eligible" persons (not relevant to Usick here), HIPAA barred insurers from imposing any preexisting condition exclusions and also barred insurers from denying individual coverage to such persons. 42 U.S.C. § 300gg–41 (2005). HIPAA, however, allowed states to opt out of the federal mandates applicable

to plans for "eligible" persons if they enacted an "acceptable alternative mechanism." 42 U.S.C. § 300gg–44 (2005). Colorado's General Assembly opted out by enacting an "acceptable alternative mechanism" known as CoverColorado. *See* § 10–16–105.5, C.R.S. 2005.

However, unlike plans for "eligible individuals," HIPAA did not allow states to opt out of its preexisting condition prohibitions for group plans. For group plans, HIPAA prohibited the imposition of preexisting condition exclusions unless:

> (1) such exclusion relates to a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6–month period ending on the enrollment date; [and] (2) such exclusion extends for a period of not more than 12 months (or 18 months in the case of a late enrollee) after the enrollment date.

42 U.S.C. § 300gg(a) (2005).

Most important here, HIPAA broadly defined a "preexisting condition exclusion" as:

> a limitation or exclusion of benefits relating to a condition based on the fact that the condition was present before the date of enrollment for such coverage, whether or not any medical advice, diagnosis, care, or treatment was recommended or received before such date.

42 U.S.C. § 300gg(b)(1)(A) (2005).

Thus, under HIPAA's group plan provisions, a "preexisting condition" is any medical condition, whether specifically described or not, that existed before the date of enrollment in a health plan. The limitation on exclusion of preexisting conditions applies to all medical conditions, regardless of whether they are generically or specifically described. *See* Requirements for Group Health Insurance Market, 45 C.F.R. § 146.111(a)(1)(i) (2005)(for group plans, a preexisting condition exclusion applies to any condition present before the effective date of coverage and "includes any exclusion applicable to an individual as a result of information relating to an individual's health status before the individual's effective date of coverage").

Subsequently, to conform with HIPAA requirements, the General Assembly amended § 10–16–118(1)(a)(I). *See* Colo. Div. Ins. Reg. 4.2.18 (1997). It separated the section into two subsections: § 10–16–118(1)(a)(I), governing group plans, and § 10–16–118(1)(a)(II), governing individual plans. In the section governing group plans, the General Assembly expressly incorporated HIPAA's preexisting condition language. We find it significant, however, that although the General Assembly created an entirely separate section governing individual plans, it left intact the 1994 language regarding preexisting conditions for that provision. *Compare* Colo. Sess. Laws 1994, ch. 311, § 10–16–118(1)(a)(I) at 1915–16, *with* Colo. Sess. Laws 1997, ch. 154, § 10–16–118(1)(a)(II) at 639–40. Moreover, according to the legislative history, unlike the 1997 changes to § 10–16–118(1)(a)(I), the 1997 amendments to § 10–16–118(1)(a)(II) were "nonsubstantive." *See* Hearings on S.B. 97–54 before the Senate Health, Education, Welfare, and Institutions Committee, 61st Gen. Assemb., 1st Sess. (Jan. 16, 1997) (handout outlining the proposed amendments included as Attachment F in legislative record); *see also Grynberg v. Colo. Oil & Gas Conservation Comm'n*, 7 P.3d 1060, 1063 (Colo.App.1999) (proper to examine legislative history to determine whether amendment was intended to substantively change law).

As discussed, the General Assembly was mandated to conform to HIPAA the requirements for group policies but not for individual policies. Thus, although it was not required to do so, if the General Assembly had wanted to extend the HIPAA restrictions on preexisting conditions to individual plans, we must assume that it would have incorporated the identical HIPAA language into the newly created individual plan section, as it did for the section on group plans. *Cf. People v. Cooper*, 8 P.3d 554, 557 (Colo.App.2000) (presumption that identical language in amendment continues same meaning), *aff'd*, 27 P.3d 348 (Colo.2001). Instead, it kept intact, in the new individual plan section, the previous 1994 language.

Thus, the General Assembly substantively amended § 10–16–118(1)(a)(I) in conformity

with HIPAA's expansion of the definition of preexisting conditions and its limitations in group plans on exclusions for such conditions, but left the new section governing individual plans, § 10–16–118(1)(a)(II), intact. Accordingly, we conclude that the intent of the General Assembly was to continue to permit, for policies for "noneligible" individuals such as Usick, the exclusion of a specifically described preexisting condition for more than twelve months.

This interpretation maintains the availability of health insurance to a person who, like Usick, on the one hand is not protected under HIPAA as an "eligible individual," while on the other hand suffers from a preexisting condition that may make her uninsurable or insurable only at prohibitive prices. Usick's interpretation of § 10–16–118(1)(a)(II) would prohibit an insurer from reducing cost by making an individual underwriting decision to extend coverage based on exclusion of her preexisting condition for more than twelve months. The trial court's interpretation, which we adopt, furthers the availability of individual health plans on the basis of such particularized underwriting decisions.

## II. Application of § 10–16–118(1)(a)(II)

Because § 10–16–118(1)(a)(II) applies only to the general category of preexisting conditions and does not prohibit the exclusion of a specifically identified condition, the specific exclusion for treatments relating to "endometriosis or complications" in Usick's policy neither dilutes required statutory coverage nor violates Colorado public policy. Thus, Usick was free to waive coverage for such treatment. *See O'Donnell v. Blue Cross Blue Shield, supra,* 76 P.3d at 313 (concluding that a waiver of coverage for a preexisting spine condition was not subject to the standard clause relating to coverage of "pre-existing conditions"); *cf. Peterman v. State Farm Mut. Auto. Ins. Co.,* 961 P.2d 487, 492–93 (Colo.1998) (voiding an insurance contract provision that diluted statutory coverage to which the insured was entitled).

## III. Ambiguity of Exclusionary Provision

Alternatively, Usick contends that her policy's specific exclusion for "endometriosis or complications" is ambiguous and therefore must be construed against American Family, its drafter. We disagree that the exclusion is ambiguous.

■ A provision is ambiguous as a matter of law if it is susceptible of more than one reasonable interpretation. The terms of a policy must be construed as understood by a person of ordinary intelligence. *See Allstate Ins. Co. v. Juniel,* 931 P.2d 511, 514 (Colo. App.1996).

Usick's policy contained a Declarations Page, which provided a general outline of her coverage and benefits. The front side read, "SEE REVERSE SIDE FOR WAIVERS AND/OR RATEUPS." The reverse side then stated:

> THIS POLICY DOES NOT COVER: TREATMENT OF CINDY M FOR ENDOMETRIOSIS OR COMPLICATIONS. 24 MONTHS* *AFTER THE INDICATED TIME LIMIT HAS EXPIRED SINCE THE EFFECTIVE DATE OF YOUR WAIVER(S) AND/OR RATE-UP(S), AND UPON YOUR WRITTEN REQUEST, WE WILL CONSIDER REMOVAL OF THE WAIVER(S) AND/OR REMOVAL OR REDUCTION OF THE ADDITIONAL PREMIUM CHARGES. NO ACTION WILL BE TAKEN UNLESS INITIATED BY YOU.

Usick argues that the provision is ambiguous because the asterisked language following "24 months" is incomprehensible. Thus, Usick continues, the asterisked language must be disregarded and, therefore, the only reasonable interpretation of the exclusion is that it lasted only for a period of twenty-four months. However, because we do not accept Usick's interpretation as reasonable, we disagree.

■ Initially, we note, the fact that the terms "waiver(s) and/or rate-up(s)" are undefined in the exclusion does not, as Usick argues, render the asterisked language incomprehensible. Undefined terms do not create ambiguity if the provision can be understood by considering its context. *See Cary v. United of Omaha Life Ins. Co.,* 108 P.3d 288, (Colo.2005); *Ackerman v. Foster,*

974 P.2d 1, 5 (Colo.App.1998); *Travelers Indem. Co. v. Howard Elec. Co.*, 879 P.2d 431, 434 (Colo.App.1994).

Here, the front side of the Declarations Page states, "SEE REVERSE SIDE FOR WAIVERS AND/OR RATEUPS," and then the reverse side states what is not covered, followed by an asterisk and language that again refers to "WAIVER(S) AND/OR RATE–UPS." Thus, even without knowing the precise meaning of a "waiver" or "rate-up," we conclude that the multiple references to "waiver(s) and/or rate-up(s)" unequivocally refer to the exclusion listed in capital letters at the top of the reverse side of the Declarations Page.

■ Moreover, to accept Usick's interpretation as reasonable, one would have to wholly ignore the asterisk following "24 months" and all the language that immediately follows it. A policyholder, however, has a duty to read the entire policy. *See Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1028 (Colo.App.2002). Here, the asterisked language immediately follows unequivocal language stating that the policy does not cover treatments for endometriosis. Thus, according to Usick, one would have to stop reading after the first exclusion, or simply determine the asterisked language to be meaningless surplusage. Faced with the capitalized, large-type statement that endometriosis is not covered, no person of ordinary intelligence would do either. *See Cruz v. Farmers Ins. Exch.*, 12 P.3d 307, 309 (Colo.App.2000) (reasonableness judged by person of ordinary intelligence).

Usick argues, nevertheless, that the use of the word "waiver" instead of "exclusion" renders the exclusionary provision ambiguous. Usick notes that two other provisions of the policy, the "Preexisting Condition" definition and the "General" provision, when read together, state that preexisting conditions will become covered after twelve months and cannot be denied coverage after two years unless the condition is "specifically excluded" from the policy. Thus, Usick argues that a reasonable policyholder would review the policy looking for an "exclusion" and that, because the provision excluding coverage for endometriosis is referred to as a "waiver,"

the exclusion was not understandable. For two reasons, we disagree.

■ First, a "waiver" that specifically states it "does not cover" a certain condition necessarily *excludes* that condition from coverage. This follows directly from the commonly understood definition of "cover," meaning "to include." *See Webster's New World College Dictionary* 335 (4th ed.1999). Thus, "not to cover" a condition necessarily means to exclude the condition from coverage. Because Usick's "waiver" states that the policy "does not cover treatment ... for endometriosis," a policyholder of ordinary intelligence would understand that it specifically "excluded" endometriosis from coverage.

Second, even if a policyholder of ordinary intelligence would not understand that the waiver "excluded" coverage for Usick's endometriosis, it would not matter because the waiver provision is expressly excluded from the general preexisting condition exclusion provision. That is, by specifically naming a condition, the waiver is a distinct provision that operates independently from the general preexisting condition provision. *See Wynn v. Wash. Nat'l Ins. Co.*, 122 F.3d 266, 269 (5th Cir.1997) (applying Louisiana law, waiver operated separately and independently from general preexisting condition exclusion). The waiver does not refer to the general preexisting condition provision. To the contrary, the fact that the waiver was included as a separate provision without referencing the general preexisting condition provision shows that the parties intended to treat Usick's endometriosis differently from any other preexisting conditions she may have had. *See Wynn v. Wash. Nat'l Ins. Co., supra*, 122 F.3d at 269 (determining that an exception endorsement in an individual policy is "qualitatively different" from a preexisting condition limitation); *O'Donnell v. Blue Cross Blue Shield, supra*, 76 P.3d at 313 (structure of policy indicated intent to treat specific exclusionary waiver differently from general exclusions for preexisting conditions); *see also Molnar v. Conseco Med. Ins. Co.*, 358 Ill.App.3d 418, 294 Ill.Dec. 388, 830 N.E.2d 800 (2005) (preexisting conditions limitation in an individual policy operates separately

and independently from the exception endorsement).

In sum, because we disagree with Usick that the exclusion is either incomprehensible or ambiguous, we agree with the trial court's refusal to construe her policy against American Family so as to afford coverage. *See Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 939–40 (Colo.1999); *Cruz v. Farmers Ins. Exch.*, *supra*, 12 P.3d at 311; *Allstate Ins. Co. v. Willison*, 885 P.2d 342, 344 (Colo.App. 1994).

Based on our disposition, we need not address the other arguments raised by the parties.

The judgment is affirmed.

WEBB and STERNBERG *, JJ., concur.