In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3219

DEBORAH A. KENSETH,

*Plaintiff-Appellant,*

*v.*

DEAN HEALTH PLAN, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08 C 1—**Barbara B. Crabb**, *Judge.*

ARGUED FEBRUARY 27, 2009—DECIDED JUNE 28, 2010

Before MANION, ROVNER and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Eighteen years after Deborah Kenseth underwent vertical gastric banding to treat her morbid obesity, her physician advised her to undergo a second surgical procedure to resolve the severe acid reflux and related maladies she was experiencing as complications of the original surgery. Before having the corrective surgery, Kenseth telephoned her health maintenance organization's customer service line to

determine whether the surgery would be covered by her insurance. She was advised that it would be, subject to a $300 copayment. But the day after she had the surgery, her HMO denied coverage, relying on provisions in the insurance plan deeming surgery and hospitalization for morbid obesity to be non-covered, along with any services or supplies related to such non-covered treatment. Kenseth's internal grievance was unsuccessful, leaving her responsible for medical bills totaling more than $77,000.

Kenseth filed suit against her HMO, Dean Health Plan, pursuant to the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), seeking relief under theories of equitable estoppel and breach of fiduciary duty as well as state law. The district court granted summary judgment to Dean. *Kenseth v. Dean Health Plan, Inc.*, 568 F. Supp. 2d 1013 (W.D. Wis. 2008).

We vacate in part and remand. The facts support a finding that Dean breached its fiduciary duty to Kenseth by providing her with a summary of her insurance benefits that was less than clear as to coverage for her surgery, by inviting her to call its customer service representative with questions about coverage but failing to inform her that whatever the customer service representative told her did not bind Dean, and by failing to advise her what alternative channel she could pursue in order to obtain a definitive determination of coverage in advance of her surgery. However, ERISA authorizes only equitable relief in cases where an individual is

seeking relief on her own behalf for a breach of fiduciary duty. It remains to be seen whether any relief that Kenseth is seeking falls within the realm of equitable relief that ERISA authorizes.

## I.

Kenseth is insured through her employer. She was hired by Highsmith, Inc., headquartered in Ft. Atkinson, Wisconsin, in May of 1996. The company is a distributor of furniture, equipment, and supplies to libraries throughout the United States and abroad. It has more than 200 employees. Highsmith sponsored a group health insurance plan for its eligible employees, and it contracted with Dean to provide the insurance. Kenseth elected to participate in Highsmith's insurance plan, and her coverage under Dean's group policy began on August 1, 1996.

Dean Health System is headquartered in Madison, Wisconsin, and bills itself as one of the largest integrated healthcare delivery systems in the United States. It operates an extensive network of clinics, the first of which was established more than 100 years ago, throughout Dane, Rock, and Walworth Counties in southern Wisconsin. Dean Health Plan/Dean Health Insurance, Inc., is the insurance services subsidiary of Dean Health System and provides insurance to Highsmith's employees. Dean Health Plan, which we shall refer to simply as Dean, is one of the largest HMOs in the Midwest.

In 1987, years before she was employed with Highsmith and enrolled in the Dean Health Plan, Kenseth had opted

to undergo a surgical procedure known as vertical banded gastroplasty ("VBG") in order to help her lose weight. VBG, often colloquially referred to as "stomach-stapling," employs surgical staples to divide the stomach into two parts, creating a small pouch or neo-stomach at the entrance to the stomach which is connected to the remainder of the stomach by a narrow outlet; a polypropylene band is placed around the outlet to keep it from enlarging over time. Food fills the neo-stomach quickly, and proceeds through the outlet into the remainder of the stomach slowly, thus causing the patient to both feel full sooner and to continue to feel full for a longer period of time. The procedure achieved its intended effect with Kenseth, helping her to both lose more than 120 pounds and keep that weight off. The procedure was paid for by her employer's health plan.

Eventually, however, Kenseth experienced complications from the VBG. The outlet connecting the neo-stomach with the remainder of the stomach began to shrink and harden, a condition known as gastric stenosis. The stenosis in turn caused Kenseth to experience a variety of ailments beginning in 2001. These included severe acid reflux, which kept her awake at night and caused her to vomit repeatedly during the day, erosion of the esophagus, several bouts of pneumonia, and severe hair loss.

By 2001, of course, Kenseth was working for Highsmith and was insured under the Dean group health insurance policy. The benefits available to Highsmith employees under that policy were set forth in a document entitled the Group Member Certificate and Benefit Summary (the

"Certificate"). The Certificate is revised annually to reflect the benefits available in each calendar year, and among other things it describes both covered and non-covered services. The Certificate identifies Dean itself as the "claims administrator" with "the discretionary authority to determine eligibility for benefits and to construe the terms of this Certificate." R. 34-6 at 29 (2005). "Any such determination or construction shall be final and binding on all parties unless arbitrary and capricious." R. 34-6 at 29 (2005).

Among the non-covered services set forth in the Certificates for the 2004 and 2005 calendar years were "[a]ny surgical treatment or hospitalization for the treatment of morbid obesity." R. 42 ¶ 8; *see* R. 34-6 at 13, 20 (2005).[1] In both years, the Certificate's list of "[g]eneral [e]xclusions and limitations" also included "[s]ervices and/or supplies related to a non-covered benefit or service, denied referral or prior authorization, or denied admission." R. 42 ¶ 9; *see* R. 34-6 at 22 (2005). In 2006, the language of this exclusion was revised to read "[s]ervices or supplies for, or in connection with, a non-covered procedure or service, *including complications*; a denied referral or prior authorization; or a denied admission." 42 ¶ 10; *see* R. 34-6 at 77 (2006) (emphasis ours).

The Certificate encourages plan participants with questions about its provisions to call Dean's customer

---

[1] The 2005 Certificate also excluded coverage for "[w]eight loss programs[,] including dietary and nutritional treatment . . . ." R. 42 ¶ 9; *see* R. 34-6 at 16.

service department. On the third page of the 2005 Certificate, under the heading "Important Information," the reader is advised to make such a call "[f]or detailed information about the Dean Health Plan." R. 34-6 at 3. Eight pages later, at the outset of the Certificate's summary of "Specific Benefit Provisions," a text box in bold lettering states, "**If you are unsure if a service will be covered, please call the Customer Service Department at 1-608-828-1301 or 1-800-279-1301 prior to having the service performed**." R. 34-6 at 11. No other means of ascertaining coverage is identified for services rendered by an in-plan provider. Such a procedure is identified for services sought on a non-emergency basis from a provider who is not part of the Dean network: a plan member's primary care physician must submit a written referral request to Dean's managed care division in advance of service being provided, and after the request, the member is notified as to whether the out-of-plan referral has been approved. R. 34-6 at 7-8.

In September 2004, Kenseth underwent an endoscopic procedure during which a balloon was used to dilate the outlet from her neo-stomach, which had become obstructed. The paperwork generated in connection with this procedure noted the connection between the obstruction of the outlet and Kenseth's VBG. The gastroenterologist who performed the procedure, Dr. Abigail Christiansen, observed in her post-operative notes that Kenseth had undergone a VBG some seventeen and one-half years earlier and identified "[g]astric outlet obstruction from the vertical banded gastroplasty" as her medical "impression." R. 34 ¶ 5; R. 34-5 at 32. The hospital's

"Outpatient Coding Clinical Summary" for the procedure also listed "acquired hypertrophic pyloric stenosis" as one of the doctor's secondary diagnoses, R. 34-5 at 29, and stenosis of the gastric outlet is a known complication of VBG. Interestingly, however, Dean paid for the procedure, notwithstanding the fact that surgical treatment for morbid obesity was a non-covered service and "services . . . related to a non-covered service" were also excluded from coverage by the terms of the 2004 Certificate.[2] The 2004 procedure evidently resolved the obstruction of Kenseth's gastric outlet for a period of time, but eventually the problem recurred. Ultimately, Kenseth

---

[2] Kenseth submitted medical records suggesting that she had undergone an identical procedure in December 2001, and was treated in a hospital emergency room in April 2002 for symptoms (including pneumonia and hair loss) apparently stemming from the VBG, and that Dean paid for these medical services as well. R. 34 ¶ 3; R. 34-2 ¶¶ 4-5; R. 34-5 at 1 ¶¶ 2-3; R. 34-5 at 3-28. The district court did not consider Dean's handling of these additional services in view of the fact that Kenseth did not propose facts detailing what these records reveal, nor had she submitted the affidavit or testimony of an appropriate medical professional to interpret her medical records and to explain the causes and significance of her medical condition at the time of treatment. 568 F. Supp. 2d at 1015-16. By contrast, the court was evidently satisfied that the proposed facts and the underlying records concerning the September 2004 procedure were sufficient, and so the court took notice of that procedure. *Id.* at 1015. Dean's counsel agreed at oral argument before this court that the September 2004 procedure was properly taken into consideration.

was referred to a bariatric surgeon, Dr. Paul E. Heupenbecker, to assess longer-term solutions to the problem.

Kenseth consulted with Dr. Huepenbecker on November 9, 2005. Dr. Huenpenbecker works at a Dean-owned clinic. Dr. Huepenbecker advised Kenseth to undergo what is known as a Roux-en-Y gastric bypass procedure as a longer-term solution to the complications she was experiencing. The doctor's notes reflect the advice that he gave to her:

> I told her that basically she has an expected problem after vertical banded gastroplasty that has been more apparent after many years have passed following this procedure. That problem specifically is stricture at the site of the Marlex [polypropylene] band placed to regulate the size of the outlet of the "neo-stomach" created with the VBG. I told her that I certainly felt that this was amenable to revision and would simply require conversion to a roux-Y gastrojejunostomy. I further told her that I felt that this was a procedure which was widely done 20 years ago and was a covered benefit even by the Dean Health Plan until very recently. To that end I believe that this would be considered revision surgery and not bariatric surgery as the patient does not need surgery for weight loss. She simply needs a procedure to correct the situation which will continue to create increasing complications for her. I told her that in my opinion she should strongly consider conversion of vertical banded gastroplasty to roux-Y gastrojejunostomy.

> She is amenable to this and we will go ahead and arrange this at this point in time.

R. 42 ¶ 14; *see* R. 26 at 6.[3] The Roux-en-Y procedure obviates problems stemming from stenosis of the gastric outlet by connecting the small gastric pouch created by the VBG directly to the small intestine, thus bypassing the outlet and the remainder of the stomach. The procedure was scheduled for December 6, 2005 at St. Mary's Hospital in Madison. St. Mary's is a Dean-affiliated hospital.

In anticipation of the Roux-en-Y procedure, Dr. Heupenbecker's office provided Kenseth with a written form that included a standard set of pre-printed instructions

---

[3] It appears there was a difference of opinion among Kenseth's physicians as to whether the Roux-en-Y procedure was likely to be covered by the Dean group insurance plan. Although Dr. Huepenbecker believed it would be, as is evident from the note that we have reproduced above, the gastroenterologist who referred Kenseth to Dr. Huepenbecker, Dr. Christiansen, thought that such corrective surgery might not be covered to the extent it was intended to address complications resulting from Kenseth's 1987 VBG. *See* R. 26 at 11. The physicians' impressions as to insurance coverage for the procedure did not bind Dean, which as we have noted had the discretionary authority as the claims administrator to construe the terms of the Certificate. R. 34-6 at 29 (2005). However, it does serve to highlight the importance of Kenseth's subsequent telephone call to Dean's customer service department to seek information from Dean itself on that very point.

along with certain details about the surgery (including the date and nature of the surgery, as well as the names of her primary physician and surgeon) that his staff filled in. Dr. Huepenbecker uses this form routinely, and to his knowledge it is commonly used throughout the Dean Clinic. The completed form described the surgery as a "Roux revision of proximal gastric stenosis." R. 42 ¶ 15; *see* R. 26 at 7. The standard instructions included the following (somewhat awkward) admonishment to Kenseth regarding her insurance:

> 7. It is the patient's responsibility to check on coverage whether prior authorization or pre-certification is needed prior to your surgery. It is also the patient's responsibility to check on coverage. **Please call your insurance company and let them know the date and type of surgery you are having.** If they need further information you may give them your nurse's phone number and they can call with questions.

R. 42 ¶ 15; *see* R. 26 at 7 (emphasis in original).

Later that same day, consistent with the instructions on the form provided to her, Kenseth called Dean's customer service number and spoke with Maureen Detmer, a customer service representative who had been employed in that capacity for about one year. Kenseth avers that she told Detmer she would be having "a reconstruction of a Roux-en-Y stenosis [sic]," R. 42 ¶ 17, *see* R. 21 at 9, Kenseth Dep. 30, and when Detmer asked her to explain the nature of the surgery, Kenseth told her "it had to deal with the bottom of the esophagus because of all the acid reflux I was having," R. 42 ¶ 17; *see* R. 21 at 9,

Kenseth Dep. 30. Kenseth did not advise Detmer that her condition was a result of the VBG she had under-gone in 1987, although Kenseth by her own account was aware of the connection; she represents that her omission of that information was not intentional. Detmer put Kenseth on hold for a moment. When she returned to the line, Detmer advised Kenseth that the procedure would be covered by her insurance, subject to a $300 copayment. The conversation between Kenseth and Detmer was not recorded, and although Detmer's practice was to make handwritten notes of such con-versations, those were destroyed after thirty days. Detmer did memorialize the call in Dean's TRACS software system, noting that Kenseth had indicated she was having reconstructive surgery on her esophagus with Dr. Huepenbecker and that Detmer had verified insurance coverage subject to a $300 copayment. By the time she was deposed in this lawsuit, Detmer had no independent recollection of her conversation with Kenseth.

Detmer was not trained to tell, and does not tell, partici-pants in Dean's health plans who call with questions about coverage that they cannot rely on her interpreta-tion of the schedule of benefits. "I don't believe I've ever said that, no," Detmer testified. R. 28 at 10, Detmer Dep. 35. One may therefore infer that Detmer did not give such a warning to Kenseth. If callers ask for information beyond what she or a supervisor have told them, she typically refers them back to the Certificate.

We should note that Kenseth, although she had looked at the Certificate on prior occasions, did not consult the

Certificate in advance of her surgery in order to see what light it might shed on the question of coverage for that procedure. Nor did she ask Dean to provide written confirmation of coverage, which is a step Dean's counsel suggests that she could have taken. Dean Br. 9. She instead relied on Detmer's oral representation that the surgery would be covered by Dean's group health insurance plan.

Kenseth's surgery proceeded as scheduled on December 6, 2005. Dr. Huepenbecker created a small pouch in the lesser curvature of the stomach, beneath the esophagus, in order to ensure an adequate blood supply to the gastric pouch or neo-stomach created in the 1987 surgery. He then connected the gastric pouch directly to Kenseth's small intestine by means of a "Roux loop," thus bypassing the remainder of her banded stomach. The gastric band inserted in 1987 remained in place.

On the following day, Dean made an initial decision to deny coverage for Kenseth's surgery and all associated services. Based on the information provided to Dean by St. Mary's regarding the surgery, Dean's utilization reviewer and its assistant medical director determined that the Roux-en-Y procedure was designed to address stenosis resulting from Kenseth's 1987 VBG. In their view, because the VBG constituted a non-covered service under Dean's insurance policy, any treatment aimed at resolving complications from that surgery was itself non-covered. By notice dated December 8, 2005, Dean formally advised Kenseth that it was denying her claim for the surgery and hospitalization:

Dean Health Plan has received information regarding your admission to St. Mary's Hospital for a surgical procedure that is related to a non covered benefit. Based on the information provided, your admission is denied at this time. As outlined in your Group Member Certificate and Benefit Summary, please refer to the section Inpatient Hospital: non covered services, number 5. Surgical services, non covered services number 4 as well as the General Exclusions and Limitations section, number 28. Please be aware that complications related to a non covered benefit are excluded from coverage. Alternatives to consider include paying privately for these services or discussing other options with your physician.

R. 42 ¶ 33; *see* R. 26 at 3.[4]

Kenseth was discharged from St. Mary's on December 10, 2005. She subsequently suffered complications from the surgery, including a persistent infection, that required her readmission to the hospital from January 14 to January 30, 2006. Dean denied coverage for her sec-

---

[4] We note that the notice's citations to the applicable exclusions are references to the 2006 Certificate, which the parties have led us to believe applied only to the 2006 calendar year. As Kenseth's surgery took place in December 2005, it is the 2005 Certificate that would have applied to her surgery and initial hospitalization. The exclusions in the two Certificates are for the most part the same, but for the addition of the word "complications" to the general exclusion for services and supplies related to a non-covered service or benefit. *See supra* at 5.

ond hospital stay as well. The costs of Kenseth's surgery and two hospital stays came to approximately $77,974.00.

Exercising her rights under the insurance policy, Kenseth pursued an internal grievance asking Dean to reconsider its decision to deny coverage for her Roux-en-Y surgery and hospitalization. Dean again asserted that these services were related to a non-covered procedure and therefore excluded from coverage. Kenseth then pursued a complaint resolution and formal written grievance, but Dean did not change its position.[5]

Kenseth subsequently filed suit asserting two claims under ERISA and one under Wisconsin law. She asserted first that Dean breached its fiduciary obligation to her in two senses: (1) the Certificate setting forth her insurance benefits was unclear as to coverage for her 2005 surgery and misleading as to the process she should follow in order to determine whether that surgery would be covered, and (2) Dean failed to provide her with a procedure (other than contacting customer service) through which she could obtain authoritative preapproval of her surgery. She analogized her situation to that of the plaintiff in *Bowerman v. Wal-Mart Stores, Inc.*,

---

[5] There was some testimony below to the effect that Dean on occasion has provided coverage when a member has incurred medical expenses in reliance on mistaken advice she has been given by one of Dean's customer service representatives, R. 30 (Paskey Dep.) at 24-26, but like the district court, we do not believe this has any material bearing on the legal issues presented in this case.

226 F.3d 574, 590-91 (7th Cir. 2000), where we held that it was a breach of fiduciary duty for the insurer to provide an insured with ambiguous plan documents and then to fail to clear up the ambiguity in conversations between the insured and the insurer's representative. Kenseth asserted second that Dean is collaterally estopped from denying benefits because Dean's customer service representative orally advised her that the surgery would be covered, and she relied on that representation. Finally, Kenseth asserted that Dean's reliance on the non-covered nature of her 1987 VBG to deny coverage for subsequent medical treatment addressing complications from that surgery ran afoul of a Wisconsin statute precluding an insurer from excluding coverage for preexisting conditions for a period of longer than twelve months.

The district court granted summary judgment to Dean on each of these claims. 568 F. Supp. 2d 1013. The court found no support in *Bowerman* for the notion that Dean had a fiduciary duty to identify a procedure through which Kenseth could confirm that her 2005 surgery was covered by her group health insurance. The court reasoned that only if the average person could not read the plan documents and determine for herself whether a particular medical condition or service is covered does the insurer have a duty to provide another means for the insured to ascertain coverage. Here, "no reasonable person reading the plan would have difficulty determining that the plan would not cover plaintiff's 2005 surgery." *Id.* at 1017. It was clear that the 2005 surgery was related to the non-covered VBG and thus fell within the Certificate's general exclusion for services and

supplies related to non-covered procedures. *Id.* The fact that the exclusion was modified in 2006 to include the term "complications" did not alter the court's view that the language as it stood in 2005 was clear: "the phrase 'related to' is not a term of art that only a technical writer can understand," and it is broad enough to include complications from a non-covered service. *Id.* Nor was the court persuaded that various other provisions of ERISA and its implementing regulations gave rise to a duty to provide a confirmation mechanism. *Id.* at 1018.

The court found the estoppel claim flawed for two principal reasons. First, in soliciting coverage informa-tion from Dean's customer service representative, Kenseth had failed to disclose that the purpose of her 2005 surgery was to remediate a complication resulting from her 1987 surgery. *Id.* at 1018-19. In light of that omission, the customer service worker's representation that Kenseth's upcoming surgery would be covered was "not necessarily inaccurate." *Id.* at 1019. Second, oral representations will not support an ERISA estoppel claim for benefits that are different from those unambiguously set forth in a written plan. As the court had already observed with respect to the fiduciary claim, Dean's certificate unambiguously excluded coverage for any services related to a non-covered service. *Id.*

Finally, the court rejected the notion that Dean was obliged to pay for the 2005 surgery in view of Wisconsin's twelve-month limit on exclusions for preexisting con-ditions. Wis. Stat. § 632.746(1)(b). As the court saw it, Kenseth was not challenging an exclusion for preexisting

conditions. "Under defendant's plan, it is irrelevant *when* plaintiff had the gastric bands inserted; *why* she did so is the only thing that matters. Defendant would have . . . denied coverage for the 2005 surgery whether she had inserted the bands before or after she joined the plan in 1996." 568 F. Supp. 2d at 1019 (emphasis in original).

## II.

We review the district court's decision to enter summary judgment against Kenseth de novo, and we are obliged in the course of our review to consider the facts in the light most favorable to Kenseth. *E.g.*, *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Although we conclude that summary judgment was warranted as to Kenseth's estoppel and state-law claims, we believe that the facts would support a finding that Dean breached the fiduciary duty it owed to her as an insurer with the discretionary authority to grant or deny her claim for benefits. We therefore vacate the grant of summary to Dean on that claim. Whether further proceedings are warranted on that claim depends on whether Kenseth is seeking a form of equitable relief that ERISA authorizes for that type of claim.

### A. Collateral Estoppel

We need not linger long over the collateral estoppel and state law claims. Equitable estoppel typically requires that the party being estopped—here, Dean—knows the relevant facts. *E.g.*, *United States v. Fitzgerald*, 938 F.2d

792, 797 (7th Cir. 1991) (quoting *Portmann v. United States*, 674 F.2d 1155, 1167 (7th Cir. 1982)). A relevant fact here was that the acid reflux and other maladies that Kenseth was experiencing, and that the Roux-en-Y procedure was intended to resolve, were caused by her 1987 VBG surgery. Insurance coverage for particular types of health care often depends on the origin of the underlying medical condition. To cite the most obvious example, many policies exclude coverage, at least for some period of time, for treatment of any medical condition that predated the insured's enrollment with the insurer—so called preexisting conditions. In this case, the policy excluded coverage for both the surgical treatment of morbid obesity and any services "related to" such a non-covered treatment. The connection between Kenseth's condition in 2005 and her 1987 VBG was thus a fact relevant to coverage under the Dean policy. It is undisputed, however, that Kenseth did not advise Dean's customer service agent of that connection notwithstanding her own awareness of the relationship. By Kenseth's own account, she informed Detmer only that the Roux-en-Y procedure "had to deal with the bottom of the esophagus because of all the acid reflux I was having." R. 21 at 9, Kenseth Dep. 30. Only after the Roux-en-Y surgery took place did Dean learn that the procedure was necessitated by complications resulting from the 1987 VBG.[6] We do not mean to imply that

_____

[6] Indeed, it is not clear whether Dean even understood, prior to receiving documentation from the hospital, that Kenseth's

(continued...)

Kenseth deliberately withheld that information; there is no evidence suggesting that she was attempting to deceive Dean or that she even fully appreciated, at that time, the significance of the 1987 surgery vis-à-vis the terms of the Certificate. But given that Dean did not know a fact that was highly material to coverage under its policy, we do not think that it can be equitably estopped on the basis of an oral representation that its agent made on the basis of limited and incomplete facts. Dean can be faulted, as we discuss below, for soliciting telephonic inquiries concerning coverage and not having appropriate cautions and safeguards in place to prevent its participants and beneficiaries from relying on the mistaken advice they are given by its customer

---

[6] (...continued)

surgery had as much if not more to do with her stomach than it did with her esophagus. Based on the (understandably) imprecise description of the surgery Kenseth had given to Detmer, Detmer's note in the TRACS software system suggested that Kenseth was undergoing reconstructive surgery on her esophagus, as opposed to surgery on her stomach and small intestine. *See* R. 31 (Reber Dep.) at 52, 55 (indicating that notation in TRACS system regarding Kenseth's surgery was inaccurate). Kenseth's description is not inconsistent with the way in which her doctors themselves described her condition and the surgery to correct it. *See* R. 34-3 ¶¶ 4, 6, 10, 12; R. 34-5 at 29. Arguably, however, reference to the esophagus alone made it even less likely that Detmer or Dean would have been alerted to the fact that this surgery was necessitated by complications resulting from the prior gastric banding procedure.

service agents. But that, we believe, is a problem more appropriately dealt with as a breach of fiduciary duty.

B. Wisconsin Statutory Limit on Exclusions for Preexisting Conditions

We also agree that summary judgment was properly granted as to Kenseth's state-law claim. A Wisconsin statute precludes a group health insurer from excluding coverage for a preexisting condition for a period of longer than twelve months. Wis. Stat. § 632.746(1)(b). Kenseth reasons that her gastric band constituted a preexisting condition and that, consequently, Dean could not exclude coverage for treatment related to the band for more than twelve months after she joined the Dean Plan in 1996. However, Wisconsin law also makes clear that the statutory limit on exclusions for preexisting conditions does not "[p]revent a group health benefit plan from establishing limitations or restrictions on the amount, level, extent or nature of benefits or coverage for similarly situated individuals enrolled under the plan." Wis. Stat. § 632.748(3). The exclusion that Dean relied on here is properly understood as a restriction on the nature of benefits provided rather than one based on a preexisting condition. *See Wynn v. Washington Nat'l Ins. Co.*, 122 F.3d 266, 269 (5th Cir. 1997) (Louisiana law) (exclusion for particular disease or injury is "qualitatively different" from exclusion for preexisting condition). Although it is true that Kenseth's VBG surgery took place before she joined the Dean plan, and her banded stomach thus could be understood as a preexisting condition,

that was not the basis on which Dean denied coverage for conditions associated with the band. Dean instead relied on the exclusions in the policy for surgeries designed to deal with morbid obesity and for any conditions related to such non-covered services. As the district court pointed out, the timing of Kenseth's VBG procedure was irrelevant to Dean's decision; the exclusions would have applied regardless of whether Kenseth had had the gastric band inserted before or after she joined the Dean plan. 568 F. Supp. 2d at 1019. We therefore agree with the district court that Dean's decision to deny coverage for the 2005 remediation surgery did not run afoul of the Wisconsin statute. *See Wynn*, 122 F.3d at 269 (reaching similar conclusion under Louisiana law); *accord Aul v. Golden Rule Ins. Co.*, 737 N.W.2d 24, 31 (Wis. Ct. App. 2007); *Usick v. Am. Fam. Mut. Ins. Co.*, 131 P.3d 1195, 1201 (Colo. Ct. App. 2006).

## C.  Breach of Fiduciary Duty

We turn, then, to Kenseth's claim for breach of fiduciary duty. As we detail below, the facts would permit the factfinder to conclude that Dean breached the obligation of loyalty it owed to Kenseth by providing her with plan documentation that was unclear as to coverage for her surgery, by inviting her and other participants to call its customer service representatives with questions about coverage but omitting to warn callers that they cannot rely on the answers they are given, and by failing to inform participants how they might obtain answers from Dean that they could rely upon. Such a finding

would permit an award of appropriate equitable relief, but not legal relief, to Kenseth.

A claim for breach of fiduciary duty under ERISA requires the plaintiff to prove: (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff. *Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007). Moreover, ERISA authorizes an award of equitable relief alone to a plan participant suing on her own behalf for breach of fiduciary duty. *See Great-West Life & Annuity Ins. Co v. Knudson*, 534 U.S. 204, 210, 122 S. Ct. 708, 712-13 (2002). Where it is clear that the plaintiff is seeking legal rather than equitable relief, dismissal of the claim may be appropriate. *See Health Cost Controls v. Skinner*, 44 F.3d 535, 537-38 (7th Cir. 1995). We take each of these points in turn.

### 1.   Dean is a plan fiduciary

Apropos of the first element, Kenseth's claim focuses on the actions and omissions of Dean rather than Detmer. Of course, it was Detmer who advised Kenseth that her Roux-en-Y procedure would be covered by Dean. But ERISA provides that "a person is a fiduciary to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other

property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Detmer fits none of these categories: she had no authority or discretion in terms of managing the Dean plan, she did not render investment advice or exercise any control over the assets of the plan, nor did she possess any discretionary authority or responsibility in the administration of the plan. Her role as a customer service representative was ministerial in nature. *See* 29 C.F.R. § 2509.75-8, D-2 ("a person who performs purely ministerial functions . . . for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary . . . "); *see also*, *e.g.*, *Kannapien*, 507 F.3d at 639 (neither plant manager nor human resources manager acted as plan fiduciary in discussing early retirement plan benefits with employees); *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1047-48 (7th Cir. 2004) (administrative manager of pension fund did not act as fiduciary in communicating with employee regarding ability to put pension application on hold); *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997) (benefits analyst did not act as plan fiduciary in advising pension plan participant how to designate beneficiary). And although Detmer was Dean's employee, and Dean, as we are about to explain, does qualify as an ERISA fiduciary, Dean cannot be held liable on the basis of respondeat superior. As we observed in *Kannapien*, "Finding that [p]lan administrators may breach a fiduciary duty

vicariously through the actions of a non-fiduciary would vitiate our requirement that an ERISA claim for breach of a fiduciary duty must be asserted against plan fiduciaries." 507 F.3d at 640 (citing *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006), and *Bowerman v. Wal-Mart Stores, Inc.*, *supra*, 226 F.3d at 590-91).

Dean is another matter, however. As an HMO and a claims administrator possessed of discretion in construing and applying the provisions of its group health plan and assessing a participant's entitlement to benefits, Dean is an ERISA fiduciary. *See* § 1002(21)(A)(i) and (iii); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220, 124 S. Ct. 2488, 2502 (2004); *Mondry v. Am. Fam. Mut. Ins. Co.*, 557 F.3d 781, 803 (7th Cir.), *cert. denied*, 130 S. Ct. 200 (2009).

As a fiduciary, Dean is obliged to carry out its duties with respect to the plan "solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; . . . [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ." 29 U.S.C. § 1104(a)(1). Dean thus owes the participants in its plan and their beneficiaries a duty of loyalty like that borne by a trustee under common law, § 1104(a)(1)(A), and it must exercise reasonable care in executing that duty, § 1104(a)(1)(B). *Mondry*, 557 F.3d at 807.

2. The factfinder could conclude that Dean breached its fiduciary obligations to Kenseth

a.

"The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990). This duty of course includes an obligation not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan, including an insurance plan. *Mondry*, 557 F.3d at 807; *Bowerman*, 226 F.3d at 590; *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993). But the duty is not limited to that negative command. It includes an affirmative obligation to communicate material facts affecting the interests of beneficiaries. *Id.* "This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not." *Id.* (citing *Eddy*, 919 F.2d at 750); *Solis v. Current Dev. Corp.*, 557 F.3d 772, 777-78 (7th Cir. 2009); *see* RESTATEMENT (SECOND) OF TRUSTS § 173, comment d (1959) (the trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person") (cited in *Eddy*). *Accord Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007) ("a fiduciary has a duty to inform when it knows that silence may be harmful and cannot remain silent if it knows or should know that

the beneficiary is laboring under a material misunder-standing of plan benefits," and "[t]he duty of loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests") (citations omitted); *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 845-46 (6th Cir. 2003) ("'once an ERISA [beneficiary] has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the benefi-ciary's circumstance, *even if that requires conveying informa-tion about which the beneficiary did not specifically in-quire*'") (quoting *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999)) (emphasis in *Gregg*); *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) ("Th[e] duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform but also an affirmative duty to inform when the trustee knows that silence might be harmful. In addition, the duty recognizes the disparity of training and knowledge that potentially exists between a lay beneficiary and a trained fiduciary. Thus, while the beneficiary may, at times, bear a burden of informing the fiduciary of her material circumstance, the fiduciary's obligations will not be excused merely because she failed to comprehend or ask about a technical aspect of the plan."); *see also Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380-81 (4th Cir. 2001); *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8-10 (2d Cir. 1997); *but see Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S. Ct. 1065, 1074-75 (1996) (reserving question whether

fiduciary has duty to disclose truthful information either on its own initiative or in response to employee inquiries).

*Eddy* is the lead opinion in this line of cases. Eddy, the plaintiff, learned that his employer was cancelling its group health insurance coverage just days before he was scheduled to have exploratory surgery. Eddy contacted the insurer, Colonial Life/Chubb, to determine whether he had the option of converting his group, employment-based coverage to an individual policy. According to Eddy's testimony (supported by his co-workers), he was informed that he had no right to make such a conversion. (Colonial Life/Chubb had no record of the call and no witness who could verify or deny Eddy's account.) Left without insurance coverage, Eddy postponed the surgery. But contrary to what Eddy said he was told, he in fact did have the right to convert his group coverage into individual coverage. He later sued Colonial Life/Chubb under ERISA contending that the insurer's failure to correctly advise him on this point constituted a breach of the insurer's fiduciary duty. The district court rejected the claim after trial, finding as a matter of fact that Eddy had asked Colonial Life/Chubb not whether he could *convert* his group coverage to individual coverage but rather whether he could *continue* his group coverage. As there was no ability to continue the group coverage given his employer's decision to terminate the plan, the court reasoned that Colonial Life/Chubb had correctly advised Eddy and consequently, in the district court's view, had not misled him in a way that might establish a breach of fiduciary

duty. The District of Columbia Circuit reversed, concluding that the district court had too narrowly understood an insurer's fiduciary duty to a beneficiary. 919 F.2d at 751.

> [R]efraining from imparting misinformation is only *part of* the fiduciary's duty. Once Eddy presented his predicament, Colonial Life was required to do more than simply *not misinform*[;] Colonial Life also had an affirmative obligation to *inform*—to provide complete and correct material information on Eddy's status and options.

> Thus, although the trial court found that "[t]he issue in this case . . . is whether plaintiff . . . used the term 'convert' as opposed to 'continue,'" Mem. Op. at 12, J.A. at 23, such a constricted standard of fiduciary duty is counter to both the letter and the spirit of the common law of trusts. Regardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary "is under a duty to communicate . . . all material facts in connection with the transaction which the trustee knows or should know." Restatement (Second) of Trusts § 173, comment d (1959). Eddy should not be penalized because he failed to comprehend the technical difference between "conversion" and "continuation." The same ignorance that precipitates the need for answers often limits the ability to ask precisely the right questions.

> This duty to communicate complete and correct material information about a beneficiary's status and options is not a novel one. Chubb expressly

> invited telephone inquires from beneficiaries. According to the testimony of Chubb's counsel and assistant secretary, Chubb maintained a separate unit charged in part with "taking phone calls" and "handl[ing] questions" about the conversion of insurance coverage. Tr. at 120. Chubb also maintained several toll-free telephone lines—including one dedicated to questions about the conversion of coverage. Trial Exhibit C. Finally, and perhaps most significantly, Chubb provided insured persons with a description of conversion options in a document that expressly directed beneficiaries: "*if you have any questions, please contact the Group Insurance Department.*"

919 F.2d at 751 (emphasis in *Eddy*). Finally, the court rejected the trial court's additional observation that Eddy had failed to write a letter or to pursue any additional contacts with Colonial Life/Chubb regarding the termination of his health benefits. "*Eddy* did not have a duty to try and try again until he received correct and complete information. Once Eddy had made clear his situation, *Colonial Life* had a duty to provide the material information." *Id.* at 752 (emphasis in *Eddy*).

Our own decision in *Anweiler* embraced the affirmative duty that our sister circuit had laid out in *Eddy*. Fiduciaries must not only refrain from misleading plan participants, we explained, but they "must also communicate material facts affecting the interests of beneficiaries." 3 F.3d at 991 (citing *Rosen v. Hotel & Rest. Employees & Bartenders Union of Phila., Bucks, Montgomery & Del. Counties, Pa.*, 637 F.2d 592, 599-600 (3d Cir. 1981)). "This

duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not." *Id.* (citing *Eddy*, 919 F.2d at 750). In *Anweiler*, a disability insurer had asked its insured to sign an agreement making the insurer the beneficiary of his life insurance policy. The insurer made the request in order to ensure that it was compensated for any excess disability payments that the insured might receive, and the insured complied. The insurer's desire for security was well founded: the insured later died owing the insurer more than $46,000 in overpayments. But when the insurer solicited the insured's signature, it failed to advise him that he was not obligated to sign the agreement in order to receive disability benefits or that he had a right to revoke the beneficiary designation at any time. Following his death, his widow, who received none of the insurance proceeds, sued the insurer. We held that the insurer's failure to apprise its insured of his options constituted a breach of fiduciary duty:

> [W]e agree with the district court that defendants breached their fiduciary duties by not giving Mr. Anweiler full and complete material information concerning the reimbursement agreement when he was asked to sign it. Reimbursements pursuant to agreements like Aetna's have previously been upheld. But Mr. Anweiler was not informed of material facts concerning this agreement in violation of the protection provided by ERISA and its fiduciary duty requirement. Furthermore, Aetna may have manipulated its position as insurer of the disability plan and life insurance policy to its own benefit rather than

> Mr. Anweiler's when it provided for reimbursement
> of one policy by way of another.

3 F.3d at 991-92 (citations omitted).

In *Bowerman*, too, we emphasized the affirmative ob-
ligation that an insurer has to provide accurate and
complete information when a beneficiary inquires about
her insurance coverage. 226 F.3d at 590. In that case,
agents of both the plaintiff's employer and her insurer
failed to advise her of the need to obtain COBRA insurance
coverage[7] for a one-month break in her service with the
employer. During that brief hiatus, the employee had
learned she was pregnant. In reliance on assurances
that her employer-sponsored coverage resumed immedi-
ately upon her return to work, the employee declined
COBRA coverage. But because her pregnancy had been
confirmed during the break, the insurer subsequently
deemed it to be a preexisting condition and refused
payment for any services related to the pregnancy. We
held that the insurer had breached its fiduciary duty to
the employee in two senses. First, the written documents
supplied to the employee regarding her insurance plan
and COBRA rights did not adequately explain the con-
nection between COBRA coverage for a break in service

---

[7] COBRA is, of course, an acronym for the Combined Omnibus
and Reconciliation Act of 1985, which amended ERISA to
grant certain departing employees the right to temporarily
extend the health insurance coverage they enjoyed during their
tenure with an employer. *See* 29 U.S.C. §§ 1161 *et seq.* (private
employers) and 42 U.S.C. §§ 300bb-1 *et seq.* (public employers).

and the insurer's exclusion for preexisting conditions. *Id.* Second, shortly after the employee's return to work, an administrative assistant responsible for benefits enroll-ment had assured her that she did not need COBRA coverage because her insurance coverage had resumed immediately upon her return. Soon thereafter, when the insurer first began to reject the submitted bills for pregnancy-related services, the employee telephoned the insurer's toll-free number as instructed in her plan sum-mary and was assured by a customer service agent that the agent would "get this fixed" for the employee. Even at that time, the employee still could have paid for COBRA coverage retroactively and solved the problem, but neither her employer's administrative assistant nor the insurer's agent said anything about that possibility. Only after time ran out on the employee's COBRA option did the insurer finally make clear to her that her break in service, coupled with her failure to obtain coverage under COBRA for that break, rendered her pregnancy a preexisting condition excluded from coverage. We deemed this too to be a breach of the insurer's fiduciary duty to the insured. "Both Spencer [the administrative assistant] and the service representative failed to provide accurate and forthright answers to Ms. Bower-man's queries about her coverage in general and about her need to obtain COBRA coverage." 226 F.3d at 591.

As we explain in greater detail below, the affirmative duty of disclosure described in these cases comes into play here, given that Dean not only permitted but encour-aged participants to call its customer service line with questions about whether particular medical services

were covered by the Dean plan. One can readily infer that Dean understood that callers like Kenseth were seeking to determine in advance whether forthcoming medical treatments would or would not be paid for by Dean, and to plan accordingly. Yet callers were not warned that they could not rely on the advice that they were given by Dean's customer service representatives and that Dean might later deny claims for services that callers had been told would be covered. Nor were callers advised of a process by which they could obtain a binding determination as to whether forthcoming services would be covered. The factfinder could conclude that Dean had a duty to make these disclosures so that participants could make appropriate decisions about their medical treatment.

b.

Before proceeding further, it behooves us to address an apparent tension between cases like *Anweiler*, which require the fiduciary to disclose material facts and circumstances to the insured, and a second line of cases beginning with our opinion in *Frahm v. Equitable Life Assur. Soc. of U.S.*, 137 F.3d 955, 958-60 (7th Cir. 1998), which hold that negligence in the course of advising an insured as to her rights and obligations under a plan is not in and of itself actionable as a breach of fiduciary duty. We read *Frahm* and its progeny to absolve a fiduciary of liability for negligent misrepresentations made by an agent of the plan to a plan participant or beneficiary so long as the plan documents themselves are clear and the fiduciary has

taken reasonable steps to avoid such errors. Kenseth's claim, which is premised on the ambiguity of the Certificate and on Dean's lack of care in training the customer service representatives from whom it has encouraged plan participants to seek coverage information, describes a type of fiduciary negligence that these cases recognize as actionable.

Section 1104(a)(1) is not a guarantee of accuracy in all communications with the insured. *Frahm*, 137 F.3d at 958-60. As we recognized in *Frahm*, mistakes in any organization are inevitable, and on occasion participants and beneficiaries will be given inaccurate advice by plan representatives, be they ministerial employees or corporate managers. *Id.* at 959-60. Deliberate misrepresentations do, of course, constitute a breach of the fiduciary's duty of loyalty. *Id.* at 959; *see also Tegtmeier v. Midwest Operating Eng'rs Pension Fund*, *supra*, 390 F.3d at 1047 (citing *Anweiler*, 3 F.3d at 991); § 1104(a)(1)(A). We have said, on the other hand, that notwithstanding the fiduciary's duty to provide complete and accurate information to the insured, mistakes in the advice given to an insured which are attributable to the negligence of the individual supplying that advice are not actionable as a breach of fiduciary duty. *Frahm*, 137 F.3d at 960; *see also Kannapien v. Quaker Oats Co.*, *supra*, 507 F.3d at 639-40; *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 466 (7th Cir. 2005); *Beach v. Commonwealth Edison Co.*, 382 F.3d 656, 658 (7th Cir. 2004); *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 640-42 (7th Cir. 2004); *but see Beach*, 382 F.3d at 668-69 (Ripple, J., dissenting) (observing that this court has not specifically considered when a plan representative's

state of mind is relevant to the duty to provide the insured with complete and accurate information, and noting that those courts that have addressed this question have rejected a requirement that misstatements be deliberate); *contra Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 830 (6th Cir. 2007) ("'A fiduciary breaches his duties by providing plan participants with materially misleading information,' even when he does so negligently, rather than intentionally.") (quoting *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002)); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1183 (9th Cir. 2004) ("We fail to see the logic in transplanting the element of scienter from the tort of deceit into a statutory ERISA claim with roots in the law of fiduciaries and trusts."); *Griggs v. E.I. DuPont de Nemours & Co.*, *supra*, 237 F.3d at 380 ("a fiduciary's responsibility when communicating with the beneficiary encompasses more than merely a duty to refrain from intentionally misleading a beneficiary," and also includes a duty "'not to misinform employees through material misrepresentations and incomplete, inconsistent, or contradictory disclosures'") (quoting *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3d Cir. 2000)).

But this does not mean that the duty to convey complete and accurate information is toothless. *Frahm* recognizes that the duty of care imposed by section 1104(a)(1)(B) entails a duty to take reasonable steps in furtherance of an insured's right to accurate and complete information. 137 F.3d at 960 ("A plan administrator satisfies § 1104(a)(1)(B) by taking appropriate precautions—such as training the benefits staff and providing

accurate written explanations—even if the precautions sometimes prove to be insufficient."). And other decisions from this court, both before and after *Frahm*, have recognized that the failure to take such actions can render a fiduciary liable for a breach of fiduciary duty. *See Tegtmeier*, 390 F.3d at 1048 (where ministerial employee who imparted erroneous advice to participant was not a fiduciary, fiduciary "might still be liable for breach of fiduciary duties if . . . [the] ministerial employee[ ] misrepresented the terms of the . . . [p]lan and the . . . [p]lan documents were not clear"); *Bowerman*, 226 F.3d at 590-91 (plan administrator breached fiduciary duty to participant where plan documents were unclear and ambiguity was exacerbated by incorrect and misleading answers representatives of plan and employer gave in response to participant's questions); *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, *supra*, 128 F.3d at 547-48 (noting that plan trustees may breach their fiduciary obligation to provide complete and correct material information to participants both by failing to exercise care in hiring, training, or retaining employees who answer participant inquiries and by failing to supply adequate written materials to participants). Thus, broad statements to the effect that "while there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable," *Vallone*, 375 F.3d at 642, must not be read *too* broadly; although negligent misrepresentations are not themselves actionable, the failure to take reasonable steps to head off such misrepresentations can be actionable.

The most important way in which the fiduciary complies with its duty of care is to provide accurate and

complete written explanations of the benefits available to plan participants and beneficiaries. Our decision in *Frahm* emphasized the primacy that ERISA bestows on the written over the spoken word: "ERISA requires firms to establish their plans in writing, to provide participants with written summary plan descriptions, and to furnish the full text of the plans on request. All of these provisions suppose that the written terms are the effective terms." 137 F.3d at 960. Thus, "providing accurate written explanations" of a participant's benefits is one of the key ways that a fiduciary complies with its duty to provide the insured with complete and accurate information and thereby satisfies its duty of care under section 1104(a)(1)(B). *Id.*; *see also Tegtmeier*, 390 F.3d at 1048; *Bowerman*, 226 F.3d at 590-91; *Schmidt*, 128 F.3d at 548; *cf. Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 682 (7th Cir. 2002) (plan fiduciary had no obligation to admonish a participant of a requirement that the plan document itself made "abundantly clear"). A plan document need not address every contingency, *Tegtmeier*, 390 F.3d at 1048, but rather may be regarded as sufficient when it address scenarios which are common enough to occur repeatedly and will affect not just the plaintiff but other plan participants and beneficiaries as well, *id.* (citing *Bowerman*, 226 F.3d at 591). It must also explain the terms of the plan in language that may be understood by the ordinary reader. 29 U.S.C. § 1022(a) (summary plan description must be "written in a manner calculated to be understood by the average plan participant").

Notwithstanding the primacy of the plan documents, because it is foreseeable if not inevitable that participants

and beneficiaries will have questions for plan representatives about their benefits, our cases also recognize an obligation on the part of plan fiduciaries to anticipate such inquiries and to select and train personnel accordingly. The fiduciary satisfies that aspect of its duty of care by exercising appropriate caution in hiring, training, and supervising the types of employees (e.g., benefits staff) whose job it is to field questions from plan participants and beneficiaries about their benefits. *Frahm*, 137 F.3d at 960; *see also Brosted*, 421 F.3d at 466; *Schmidt*, 128 F.3d at 547-48.

In sum, when the plan documents are clear and the fiduciary has exercised appropriate oversight over what its agents advise plan participants and beneficiaries as to their rights under those documents, the fiduciary will not be held liable simply because a ministerial, non-fiduciary agent has given incomplete or mistaken advice to an insured. *E.g.*, *Brosted*, 421 F.3d at 466; *Frahm*, 137 F.3d at 960; *Schmidt*, 128 F.3d at 547-48. In that situation, the fiduciary has done what it can reasonably be expected to do to ensure that the insured receives accurate and complete information; that mistakes may nonetheless occur is an unfortunate fact of life that does not bespeak actionable negligence on the part of the fiduciary. *Frahm*, 137 F.3d at 960.

But by supplying participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject. *Bowerman*, 226 F.3d

at 591 ("'[i]f the written materials [are] inadequate, then the fiduciaries themselves must be held responsible for the failure to provide complete and accurate information in the event that a nonfiduciary agent provides misleading information'") (quoting *Schmidt*, 128 F.3d at 548). This is especially true when the fiduciary has not taken appropriate steps to make sure that ministerial employees will provide an insured with the complete and accurate information that is missing from the plan documents themselves. *See Frahm*, 137 F.3d at 960; *Schmidt*, 128 F.3d at 547-48.

Kenseth's claim, as we shall see, fits within these parameters. Her claim is not based on the simple premise that Detmer gave her inaccurate advice as to the coverage for her Roux-en-Y procedure. It is based instead upon Dean's failure, both in writing the Certificate and in training Detmer and its other customer service agents, to ensure that plan participants received complete and accurate information. In particular, Kenseth alleges that Dean failed to take reasonable steps to ensure that participants like herself understood that they could not rely upon the coverage advice of its customer service agents and knew where and how they could seek advice that they *could* rely on. Her claim is thus consistent both with *Anweiler*'s recognition that fiduciaries have a duty to disclose material information to plan participants and with *Frahm*'s admonition that fiduciaries may not be held liable solely for the mistaken representations of non-fiduciary, ministerial employees.

c.

One additional point regarding the nature of Dean's duty as a fiduciary demands to be made before we proceed with our analysis. We are not called upon to decide in this case whether a health insurer like Dean has a duty to give its insured binding advice before a medical service is rendered as to whether the policy will cover that service. Our decisions have observed generally that an insurer bears no duty to provide an advisory opinion to every beneficiary based on his or her unique circumstances. *E.g.*, *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 817-18 (7th Cir. 1997). On the other hand, where one is seeking medical treatment on a non-emergency basis, there is a logical need to know in advance whether his or her insurer will cover that treatment and to plan accordingly. Upon learning that his or her insurer will not cover a particular treatment, one may elect to pursue an alternative treatment which will be covered, to obtain different coverage (e.g., through one's spouse) which will cover the treatment, or, if there is no coverage available, forego or delay treatment or seek treatment in a less costly setting. *See Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 793-94 (7th Cir. 1996); *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992); Walecia Konrad, *Going Abroad to Find Affordable Healthcare*, N.Y. TIMES, March 21, 2009, at B6. Thus, at least two courts have concluded, albeit without extended analysis, that a health insurer does have a good faith duty to advise its insured in advance of treatment whether it deems a particular treatment to be medically necessary, such that it will be covered by the insur-

ance plan. *See State Farm Mut. Auto. Ins. Co. v. Gueimunde*, 823 So. 2d 141, 144 (Fla. Dist. Ct. App. 2002); *Eggiman v. Mid-Century Ins. Co.*, 895 P.2d 333, 335-37 (Or. Ct. App. 1995) (citing *McKenzie v. Pacific Health & Life Ins. Co.*, 847 P.2d 879, 881 (Or. Ct. App. 1993)). But the existence or not of a duty to advise the insured in advance of treatment whether the insurer will cover it has not been briefed here, and for two reasons, we need not decide whether the insurer bears such a duty. First, Dean has not denied that Kenseth could have obtained a definitive decision in advance of her Roux-en-Y surgery as to whether the procedure was covered by the policy. Although it faults Kenseth for relying on what she was told by its customer service representative, Dean suggests that Kenseth might have written a letter or pursued some other, unspecified course in order to obtain binding advice from Dean as to the policy's coverage. Dean Br. 9. Indeed, Dean's response below to Kenseth's proposed facts also disputed her assertion that there was no such procedure; Dean cited testimony suggesting that medical personnel, at least, could obtain authoritative determinations regarding coverage in advance of treatment. R. 42 ¶¶ 11, 30; *see* R. 27 (Breheny Dep.) at 44, 48-49 (noting that doctors occasionally call Dean's customer service line seeking coverage information, but adding that there is no official procedure for obtaining binding coverage advice in advance of treatment). Second, and as we have noted already, the Certificate itself urges participants with doubts about whether a particular service will be covered to call Dean's customer service line "prior to having the service performed," R. 34-6 at 11,

suggesting Dean's willingness to provide advice as to policy coverage before treatment is obtained. We shall therefore assume that it was possible for a participant in the Dean plan to obtain a benefits determination in advance of treatment. But as should be evident from the following discussion, whether such advance determinations were or were not available from Dean, the critical omission on Dean's part was its failure to communicate that information to Kenseth.

d.

With these initial points made, we turn to an analysis of the evidence that the parties put before the court on summary judgment to determine whether that evidence presents a triable question of fact as to whether Dean breached its fiduciary obligations to Kenseth. We begin with a threshold question about the clarity of the Certificate as to coverage for the type of surgical procedure that Kenseth underwent.

Kenseth's claim presumes that it would not have been clear to an average participant in the Dean plan whether her Roux-en-Y procedure would be covered by the plan. Kenseth did not actually consult the Certificate prior to her surgery; she instead followed the pre-operative instructions given to her by her surgeon and telephoned Dean's customer service line to obtain that information. Whether the Certificate provided a straightforward answer on this point is nonetheless important, for if the Certificate was clear as to coverage for Kenseth's surgery, any silence or ambiguity in the Certificate as to an alternate

means of obtaining binding coverage advice would be immaterial; Kenseth need only have consulted the Certificate. This was the district court's rationale: because it would have been clear to an ordinary reader of the Certificate that Kenseth's surgery was excluded from coverage as a service that was "related to" a non-covered service (the prior VBG), Dean had no duty to identify a procedure by which she could obtain preapproval for the surgery. 568 F. Supp. 2d at 1017. Dean makes the same point on appeal. It further contends that any mistake Detmer may have made in advising Kenseth that her surgery would be covered by the plan amounts to the very kind of innocent misrepresentation by a non-fiduciary for which *Frahm* and similar cases say the fiduciary cannot be held liable.

However, we reject the notion that it would have been clear to the average reader of the Certificate that the plan excluded coverage for any medical services aimed at resolving complications resulting from an earlier surgical procedure for morbid obesity, however long ago that procedure may have taken place.

We may take it as a given that a layperson would have understood from the terms of the Certificate that Kenseth's original VBG procedure (had it been performed in 2005) would not have been covered by the plan. The 2005 Certificate twice states that "[a]ny surgical treatment or hospitalization for the treatment of morbid obesity" is a non-covered service. R. 34-6 at 13 ("Inpatient Care"), 20 ("Surgical Services"). That language is straightforward, and although one has to read through general

provisions for inpatient care and surgical services to find it, we may assume that a layperson facing in-patient surgery would consult one or both sections and would, in fact, discover the exclusion.

Far less straightforward is the exclusion for "[s]ervices and/or supplies related to a non-covered benefit or service, denied referral or prior authorization, or denied admission." R. 34-6 at 22. That provision was one of twenty-three "General Limitations and Exclusions" set out at the end of the "Specific Benefit Provisions" section of the 2005 Certificate. To appreciate relevance of that exclusion, one would have to understand that because the 2005 Roux-en-Y procedure was intended to resolve complications resulting from the 1987 VBG surgery, the Roux-en-Y surgery itself was a service "related to" the VBG, and because the VBG would be excluded from coverage in 2005 as a surgery for morbid obesity (whatever its status might have been in 1987), the Roux-en-Y procedure was likewise excluded as a service related to a non-covered service. But it is anything but certain that a layperson would realize that treatment for complications occurring some eighteen years after a procedure that currently is not covered under the plan (although it may have been covered previously) is treatment that is "related to" the non-covered procedure. One might rationally believe the "related to" exclusion to cover only those medical services and supplies (e.g., hospitalization, medication, and rehabilitation) that are necessarily and contemporaneously provided with the non-covered procedure, as opposed to services supplied decades later to deal with the procedure's after-effects. *Compare*

*Fuller v. CBT Corp.*, 905 F.2d 1055, 1057 (7th Cir. 1990) (suggesting in dicta that "even if a vasectomy reversal is not a covered procedure, an illness incident to the procedure—infection, complications, iatrogenic injury, whatever—would be covered" as a condition necessitating medical treatment), *with Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir. 1999) (reaching a contrary conclusion, and noting that coverage for complications resulting from non-covered procedure was not presented in *Fuller*, nor was the broad discretionary authority of the plan administrator to construe scope of plan). One might also think that if the original procedure was covered at the time it was performed, subsequent remedial measures would also be covered, even if the original procedure is no longer covered by the plan.

The ambiguity in Kenseth's case would only have been reinforced by the fact that Dean had already paid for at least one prior procedure aimed at ameliorating complications from the VBG procedure. Recall that in September 2004, Kenseth underwent an endoscopic procedure in which a balloon was used to dilate her gastric outlet, which had become obstructed due to hardening and shrinking (stenosis) over time. There appears to be little, if any, question that the stenosis was a complication of the VBG: that relationship was noted by the treating physician, Dr. Christiansen, who in her post-operative notes acknowledged that Kenseth had undergone a VBG more than seventeen years earlier and who described her "impression" as "[g]astric outlet obstruction from the vertical banded gastroplasty." R. 34 ¶ 5; R. 34-5 at 32. Yet, Dean paid the $1,764.10 in costs

associated with this procedure (R. 34 ¶ 7; R. 34-5 at 41) despite the exclusion in the 2004 Certificate for any services related to a non-covered service.[8] We do not mean to suggest that Dean, having previously paid for procedures related to the 1987 VBG, bound itself to pay for all such procedures thereafter regardless of whether the terms of the plan covered those procedures. *Cf. Carr*, 195 F.3d at 295 (not arbitrary and capricious for plan to deny coverage for treatment related to gastric stapling

---

[8] As we noted earlier, *see supra* n.2, it appears that Kenseth had undergone a similar endoscopic procedure in December 2001 for which Dean also paid. R. 34 ¶3. The medical records regarding that procedure are also rife with notations of the connection between the acid reflux and other symptoms she was experiencing and the 1987 VBG procedure. R. 34-5 at 3, 7, 10, 12, 13, 14, 17. The evidence suggests that the exclusion in the Dean plan for medical services related to morbid obesity was in place in 2001 as well. *See* R. 30 (Paskey Dep.) at 6, 14 (indicating that surgery for morbid obesity had been excluded from coverage since at least January 1996). However, the district court did not consider those records because Kenseth did not propose facts detailing the significance of these procedures nor did she lay an appropriate foundation for the interpretation of the records. 568 F. Supp. 2d at 1015-16. The records may largely speak for themselves in terms of the notice they provided to Dean of the link between Kenseth's condition and her prior VBG; but it is true that Kenseth proposed no specific facts concerning the December 2001 procedure as she had with the 2004 procedure. *Compare* R. 34 ¶ 3 with R. 34 ¶¶ 4-8. We shall therefore confine our attention to the 2004 procedure.

surgery notwithstanding its agreement to pay for another remedial procedure, where plan noted it would pay for no future surgeries related to gastric stapling). Our point instead is that the interplay between the plan's exclusion for procedures aimed at reversing morbid obesity and any services "related" to such procedures would if anything have been less obvious to Kenseth once she had undergone one or more procedures related to the VBG for which Dean paid.

In that respect, the addition of the term "complications" in 2006 to the exclusion for services related to a non-covered service or benefit may have helped clarify the reach of the exclusion. A layperson might realize that a complication can occur well after a non-covered surgery or treatment, even years later. But that term was not added to the exclusion until 2006, and the parties agree that the 2005 rather than the 2006 Certificate applied to Kenseth's surgery and initial hospitalization in December 2005.

This is not to say that we are quarreling with Dean's broad interpretation of the exclusion. As we have noted, the Certificate itself grants Dean "the discretionary authority . . . to construe the terms of this Certificate" and declares that Dean's construction "shall be final and binding on all parties unless arbitrary and capricious." R. 34-6 at 29; *see generally Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); and *see, e.g., Carr*, 195 F.3d at 296-97 (holding that it was not arbitrary and capricious for benefits review committee to interpret insurance exclusion for services provided "in connec-

tion with" a non-covered procedure, including gastric stapling, to bar coverage for subsequent surgery to address complications occurring years later as a result of gastric stapling). No doubt in view of the broad discretion granted to Dean, Kenseth herself has not asserted a denial-of-benefits claim challenging Dean's construction of the Certificate's language. *See* 29 U.S.C. § 1132(a)(1)(B).

It is simply to say that reading the specific exclusion for the surgical treatment of morbid obesity in pari materia with the separate, general exclusion for any services related to a non-covered service would not necessarily yield obvious results for the layperson.[9] A conscientious layperson, attempting to determine whether the "related to" language applied to treatments

---

[9] *See generally* Brian H. Allgood, *Use of Federal Estoppel Doctrine to Establish Coverage Under Group Health Ins. Policy*, 43 AM. JUR. PROOF OF FACTS THIRD § 1 (1997) ("For a number of reasons, determining the extent and scope of coverage under an employee group health insurance policy can prove extremely difficult for the average insured. As is the case with most insurance policies, the terms of the typical group health policy are commonly complex, convoluted, and difficult for the layperson to understand. Summary plan descriptions, which are generally distributed to employees by the employer or by the administrator of the employer's plan, are designed to facilitate the understanding of plan provisions, [but] even these documents leave many coverage questions far from clear. The confusion posed by the standard group health policy is compounded by the regularity with which such plans are amended or revised. . . .") (footnotes omitted).

for complications occurring years after surgery for morbid obesity, might be inclined to seek advice from a plan representative as to the scope of this language. But certainly the meaning of the exclusion for services related to non-covered services is not so clear that it would give the layperson cause to disregard any advice she was given.

This leads us to a second respect in which the Certificate was unclear: it does not identify a means by which a participant or beneficiary may obtain an authoritative determination as to whether a particular medical service will be covered by the plan. As we have mentioned, Dean concedes that there were means by which participants could seek such a determination. But nowhere in the Certificate is the appropriate path identified.

What the reader of the Certificate *is* advised to do is to contact Dean's customer service line if she is "unsure if a service will be covered," R. 34-6 at 11, suggesting that a customer service representative will have any answers that the reader cannot glean from the Certificate itself. That invitation is unaccompanied by any sort of warning alerting the reader that she cannot rely on what a customer service representative might tell her, and that Dean might later deny coverage for a service the customer service representative assures her will be covered. In short, a participant who, upon reading the Certificate, has questions regarding the meaning of the Certificate's terms and their application to her particular condition and treatment, will reasonably believe that Dean's customer service representatives will be able to answer those questions authoritatively.

Questions of that sort are no doubt commonplace among participants. Kenseth, for example, would not have found the term "Roux-en-Y" anywhere in the Certificate, nor would she have found provisions dealing more generically with epigastric surgery. She would instead have had to consult the plan's provisions for "Inpatient Care," "Medical Services," and "Surgical Services," and determine whether her forthcoming inpatient surgery fell within the descriptions of covered services but not within one of the specific or general exclusions. And, as discussed, had she considered the relevance of the exclusion for services "related to" other non-covered services, she would have had to determine how broad that exclusion was. Many, if not most, laypersons will have difficulty ascertaining which benefit provisions apply to their medical conditions and treatment and in construing multiple, independent provisions of the plan together. *See* n.9, *supra.* Even those who feel confident in their own construction of the plan are likely to want confirmation from the insurer that they have understood the plan terms correctly. They will do exactly what Dean encouraged its participants to do: call customer service.

Dean makes much of the fact that Kenseth did not read the Certificate before calling customer service. That might matter if the Certificate made clear that Kenseth's Roux-en-Y procedure was excluded from coverage, if it warned her not to rely on what Dean's customer service agents told her about the plan's coverage, or if it revealed how Kenseth might obtain authoritative advice on whether her Roux-en-Y procedure would be

covered by the plan. The Certificate did none of these things. The one and only course of action it advised the reader in terms of seeking additional information as to whether a particular course of treatment was covered by the Dean plan was to call Dean's customer service line. (Contacting her insurer was also the course of action advised by the written instructions given to Kenseth by her surgeon, a Dean-affiliated physician.) If Kenseth is to be held to the terms of the Certificate, as Dean argues, then Dean must be held to them as well. The Certificate encouraged participants to contact Dean's customer service line before undergoing treatment to determine whether the treatment would be covered by the plan, and that is exactly what Kenseth did.

Kenseth evidently was not alone in pursuing that course. Detmer, the customer service representative with whom Kenseth spoke, estimated that up to fifty percent of the thirty to forty calls that she handled on an average day involved questions about coverage. R. 28 at 12, Detmer Dep. 43.[10] From this we may readily infer

---

[10] Dean contends that Detmer's testimony on this point should be disregarded, as Detmer said that she was only "just guessing as an estimate" as to the percentage of her calls that related to coverage. R. 28 at 12, Detmer Dep. 43. However, as a customer service representative with one year's experience, Detmer was in a position to know how many coverage calls she fielded, and although she could not put a firm number on the percentage, she nonetheless did venture that "fifty percent, maybe less" of the calls related to coverage.

(continued...)

that plan participants and beneficiaries were following the advice given in the Certificate and seeking answers to coverage questions from Dean's customer service representatives. As the author of the Certificate, Dean may of course be charged with the knowledge that readers of the Certificate were given no written warning not to rely on what customer service agents told them about coverage and were given no advice as to how they might otherwise obtain authoritative answers as to which medical services were covered by the plan and which were not. One may infer, in short, that Dean knew that callers to its customer service line were likely to rely on what the agents told them. *See Eddy*, 919 F.2d at 751 (finding "perhaps most significant[ ]" the fact that insurer provided beneficiaries with written description of policy conversion options that expressly invited beneficiaries to telephone its conversion department with questions).

These shortcomings in the Certificate—the uncertain scope of the exclusion for services related to non-covered services, the failure to identify a means of preauthorizing medical services, and the invitation to contact Dean's customer service representatives with coverage questions without any warning not to rely on the advice imparted by such representatives—place into focus what Dean's

---

[10] (...continued)
R. 28 at 12, Detmer Dep. 43. Any doubts about the accuracy of her estimate go to the weight rather than the admissibility of her testimony.

customer service agents were trained to tell callers with coverage questions and what Detmer did or did not say to Kenseth. As discussed, the decisions from this court which absolve fiduciaries of liability for negligent misrepresentations made to plan participants presume that the written documents provided to the participant are clear and that the agents who advise participants and beneficiaries on behalf of the plan have been properly selected, trained, and supervised. *E.g.*, *Frahm*, 137 F.3d at 959-60; *Schmidt*, 128 F.3d at 547-48. In this case, the Certificate was not clear in key respects, and as decisions like *Bowerman* reveal, that lack of clarity can render a plan fiduciary liable for the mistaken and/or materially incomplete advice its agent has given to a participant. 226 F.3d at 591.

The evidence supports the inference that Dean failed to instruct its customer service agents to warn callers that they could not rely on what the agents told them over the phone in response to coverage-related questions.[11]

---

[11] Both Detmer and Jean Breheny, a former Dean employee who initially reviewed the admissions documentation from Kenseth's surgery and hospitalization, testified that they did not warn Dean members not to rely on what they were orally advised by Dean's customer service representatives. R. 42 ¶¶ 22, 30. Below, Dean disputed the notion that their testimony supported a global inference that no such warnings were ever given by its customer service representatives. R. 42 ¶ 30. However, Dean has cited no evidence that such warnings were given or that its customer service representatives were trained to give such warnings, and given our obligation to

(continued...)

When Kenseth sought advice about whether the Dean plan would cover her Roux-en-Y procedure, she was told that it would, subject to a $300 copayment. So far as the record reveals, she was not warned that she could not rely on this representation, that Dean might reach a different conclusion after Kenseth had the surgery and bills were submitted to Dean for payment, or that the written terms of the Certificate controlled regardless of what the customer service agent advised Kenseth orally. *Cf. Bonilla v. Principal Fin. Group*, 281 F. Supp. 2d 1106, 1116-17 (D. Az. 2003) (insurer not estopped from denying coverage for surgery and hospitalization it pre-certified, when insurer's agent orally advised representatives of doctor and hospital that pre-certification did not guarantee payment but rather that payment would depend on plan provisions, and callers were asked, "Do you understand this disclaimer?"); *England v. John Alden Life Ins. Co.*, 846 F. Supp. 798, 801 (W.D. Mo. 1994) (insurer did not breach fiduciary duty by denying coverage for plaintiff's hospitalization after twice pre-certifying plaintiff's hospital admission as appropriate, where insurer sent plaintiff written pre-certification notices warning that certification "does not guarantee payment of benefits").

Dean suggests that no such warnings were necessary, pointing out that the Certificate contained an "Oral Statements" provision stating:

---

[11] (...continued)
construe the facts in Kenseth's favor, we believe it a fair inference on this record that such warnings were not given as a matter of course.

> No oral statement of any person shall modify or otherwise effect [sic] the benefits, limitations, exclusions, and conditions of this contract; convey or void any coverage; increase or reduce benefits described within this Policy; or be used in the prosecution or defense of a claim under this Plan.

R. 34-6 at 29. A lawyer would understand that this provision barred any oral modifications to Dean's plan. But we do not think that a layperson would understand this to mean that she could not rely on what Dean's customer service agent told her in response to a question about coverage. Kenseth, after all, was not calling Dean's customer service line with the intent to request a modification of the Certificate's provisions, *cf. Tegtmeier*, 390 F.3d at 1048 (plaintiff sought to create application "hold" procedure which did not exist under clear written terms of pension plan); she was calling, instead, to find out what the Certificate provided with respect to her forthcoming surgery. In effect, she was asking the customer service agent to tell her what the Certificate said. One might reasonably conclude that Dean, having invited such inquiries, and being on notice that its members regularly called its customer service line to pose such inquiries, became obligated to warn callers that they could not treat the oral representations of its agents as authoritative. *See Anweiler v. Am. Elect. Power Serv. Corp.*, *supra*, 3 F.3d at 991 (fiduciary's duty to communicate material information "exists when a beneficiary asks for information, and even when he or she does not") (citing *Eddy*, 919 F.2d at 751); *Kalda v. Sioux Valley Physician Partners, Inc.*, *supra*, 481 F.3d at 644 (fiduciary bears duty to inform "when it knows that silence may be harmful"); *Bixler v.*

*Cent. Pa. Teamsters Health & Welfare Fund*, *supra*, 12 F.3d at 1300 (same); *see also* RESTATEMENT (SECOND) OF TRUSTS § 173, comment d.

The factfinder might also conclude that Dean further breached its fiduciary obligations in failing to train its customer service representatives to advise callers like Kenseth how they might obtain definitive advice as to whether forthcoming medical treatments would be covered by the policy. As we have pointed out, nowhere in the Certificate is the reader given any suggestion that there exists a course of action other than calling Dean's customer service representatives in order to determine whether an in-plan medical service will be covered by the policy. *See Eddy*, 919 F.2d at 752 (noting insured who was given incorrect information by insurer over telephone "did not have a duty to try and try again until he received correct and complete information"). Nor, so far as the record reveals, are callers to Dean's customer service line told how they might go about seeking such a determination. They are instead left to guess as to how they may obtain coverage information that they can rely on, and for that matter whether they need to do so.[12]

---

[12] The (separate) Member Handbook provided to participants in the Dean Health Plan did admonish members that "[i]f you have any questions about coverage under your specific policy, always refer to the Member Certificate and Schedule of Benefits or other policy documents issued to you," R. 34-7 at 4, and similarly that "[i]t is important to always look at both the Member Certificate and Schedule of Benefits to determine

(continued...)

Dean's insistence that Kenseth could have found out everything she needed to know simply by reading the Certificate rather than relying upon what she was told by Dean's customer service representative treats its relationship with her as an arm's-length, buyer-beware sort of relationship. It assumes that any layperson should be able to confidently construe the myriad benefit provisions and exclusions set forth in the Certificate and apply those to her own medical situation. And it assumes that she will not take literally the Certificate's invitation to call Dean's customer service line to resolve any coverage matters about which she is unsure.

But this was not an arm's-length relationship. Dean was a fiduciary, and in that capacity it owed Kenseth a duty to administer the plan solely in *her* interest, not its own. § 1104(a)(1)(A)(i). In this case, the factfinder could conclude that this duty included an obligation to warn Kenseth, whose call to customer service it had invited, that she could not rely on what its customer service

---

[12] (...continued)

benefits covered under your plan," R. 34-7 at 19. Detmer testified that it was her practice to give the same advice when callers to Dean's customer service line wanted information beyond what she or a supervisor could tell them, R. 28 at 12, Detmer Dep. 43. But, of course, the Certificate itself encouraged members with questions or doubts about coverage to call customer service, R. 34-6 at 3, 11, and such callers were not warned that they could not rely on what they were told by Dean's customer service representatives, R. 42 ¶¶ 22, 30; n.11, *supra*. *See Eddy*, 919 F.2d at 751-52.

agent told her about coverage for her forthcoming surgery and hospitalization. And, given that Dean does not dispute that there was a means by which she could have obtained coverage information that she *could* have relied on, the factfinder could further conclude that Dean was also obliged to tell her by what means she could obtain that information.[13]

These facts, construed favorably to Kenseth, lead us to conclude that a factfinder could reasonably find that Dean breached the fiduciary obligation that it owed to Kenseth as the party charged with discretionary authority to construe the terms of her health plan and to grant or deny her claim for benefits—including the duty to provide her with complete and accurate information. We may assume for the sake of argument that Dean simply could have told HMO members with questions about the scope of their insurance coverage to read the Certificate for themselves. *Cf. Chojnacki v. Georgia-Pacific Corp., supra,* 108 F.3d at 817 (not misleading for human resources employee to refer plaintiff with questions regarding "tin parachute" plan for lump-sum severance payments to plan document itself; indeed, "that may have been safest answer," as opposed to speculating

---

[13] A prudent insurer might also have trained its customer service representative to alert a caller like Kenseth to the types of circumstances that likely would have a bearing on coverage for her treatment including, for example, whether the treatment was related to a non-covered service. But we need not explore whether it was obliged to give this type of advice to callers.

about merits of plaintiff's entitlement to such benefits). It did not. Instead, the Certificate itself encouraged members with questions about coverage to call Dean's customer service line before services were rendered. That is what Kenseth's in-plan physician also advised Kenseth to do. And it is what she did. Kenseth was told that her surgery would be covered. But she was not warned that this advice was not binding and that Dean might later reject coverage for her surgery and hospitalization based on the additional information it acquired. Nor was she told how she might otherwise obtain a definitive decision, in advance of her surgery, as to whether Dean would cover it.

### 3. The factfinder could find that Kenseth was harmed

The factfinder might also conclude that Kenseth was injured by the breach of fiduciary duty. As we noted in our summary of the facts, Kenseth had been treated for the complications resulting from her VBG surgery since 2001. She had, for example, undergone one or more dilations of her gastric outlet to address the stenosis of the outlet, and although the ameliorative effects of those procedures and the other treatments she was receiving were neither complete nor permanent, the record suggests that she could have continued to pursue such treatments for at least some additional period of time beyond December 2005. That is the upshot of Dr. Huepenbecker's declaration, in which he averred that although the Roux-en-Y procedure was the best option to resolve the complications Kenseth was experiencing,

it was not necessary that Kenseth have the procedure in 2005. R. 42 ¶ 40; *see* R. 34-3 at 3 ¶ 22.[14] Even if Kenseth were unable to show that a postponement of the surgery would have enabled her to obtain alternative insurance coverage that would have reimbursed her for the procedure, she might be able to show that she could have undergone the same surgery elsewhere for less money, postponed the surgery until she and her husband had saved the money to pay for the procedure, or pursued other treatments.

Whether Kenseth's injury is one that may be remedied by any of the equitable relief authorized by ERISA is a separate question that we take up in the next section of our analysis. But she has, at the least, presented evidence that would permit the factfinder to conclude that she was harmed by Dean's alleged breach of fiduciary duty.

4.  It is not clear whether Kenseth seeks a remedy that ERISA authorizes for the asserted breach of fiduciary duty

An issue that the parties have not yet addressed is whether there is any form of relief that Kenseth is seeking for Dean's alleged breach of fiduciary duty that ERISA actually authorizes. Kenseth's complaint suggests

---

[14] We do note that the record is not one-sided on this point, as Kenseth in the formal grievance she filed with Dean asserted that her December 2005 Roux-en-Y procedure was "very necessary" to her at that time. R. 43 ¶ 61.

that she is seeking compensatory relief for the harm resulting from the alleged breach. But that type of relief is not authorized by ERISA.

The relevant provision of ERISA is section 1132(a)(3). As we have discussed, section 1104(a)(1)(B) imposes a duty of care upon the ERISA fiduciary. Section 1109(a) imposes personal liability on the fiduciary whose breach of the obligations imposed by the statute results in a loss to the plan, and further subjects the fiduciary to "such other equitable or remedial relief as the court may deem appropriate . . . ." Pursuant to section 1132(a)(2), a plan participant or beneficiary (among others) may commence a civil action for appropriate relief under section 1109(a), but she may do so only in a representative capacity on behalf of the plan, not in her own behalf. *See Varity Corp. v. Howe, supra*, 516 U.S. at 515, 116 S. Ct. at 1079 (section 1132(a)(2) "does not provide a remedy for individual beneficiaries"); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140-44, 105 S. Ct. 3085, 3089-91 (1985); *Magin v. Monsanto Co.*, 420 F.3d 679, 687 (7th Cir. 2005); *Steinman v. Hicks*, 352 F.3d 1101, 1102 (7th Cir. 2003); *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 863 (7th Cir. 1997). Kenseth has filed suit to recover for the injuries that Dean has caused to her rather than to the plan as a whole. She therefore must be suing under the statute's catch-all provision, section 1132(a)(3). That provision authorizes a civil suit by a plan participant or beneficiary (and also a fiduciary) "(A) to enjoin any act or practice which violates any provision or this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of

this subchapter or the terms of the plan[.]" As its terms suggest, section 1132(a)(3) does permit a plan participant to seek redress in her own behalf for a breach of fiduciary duty. *E.g.*, *Steinman*, 352 F.3d at 1102. However, the language of this section also imposes an important limitation on the type of relief that is available: it allows only injunctive and "other appropriate equitable relief"; compensatory damages and other forms of legal relief are beyond the scope of the relief authorized. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 113 S. Ct. 2063 (1993); *see also*, *e.g.*, *Buckley Dement, Inc. v. Travelers Plan Administrators of Ill., Inc.*, 39 F.3d 784, 787-88 (7th Cir. 1994).

The equitable relief authorized by section 1132(a)(3) includes "those categories of relief that were *typically* available in equity . . . ." *Mertens*, 508 U.S. at 256, 113 S. Ct. at 2069 (emphasis in original). Injunctions, mandamus, and restitution are among those categories of relief. *Ibid.* Restitution, which holds out the prospect of monetary relief to the plaintiff, can be either legal or equitable in nature. *Mondry v. Am. Fam. Mut. Life Ins. Co.*, *supra*, 557 F.3d at 806 (citing *SEC v. Lipson*, 278 F.3d 656, 663 (7th Cir. 2002)). Given that only equitable remedies are available under section 1132(a)(3), restitution is permitted only when it may accurately be characterized as an equitable remedy. *Great-West Life & Annuity Ins. Co. v. Knudson*, *supra*, 534 U.S. at 212-18, 122 S. Ct. at 714-17. The classic example is when the defendant has wrongfully obtained or withheld the plaintiff's money or property, and a constructive trust or equitable lien is imposed to ensure that the defendant disgorges his ill-gotten gain and the plaintiff receives that to which he is entitled. *Id.* at 213-14,

122 S. Ct. at 714-15; *see also Solis v. Current Dev. Corp., supra*, 557 F.3d at 777-78; *Mondry*, 557 F.3d at 806-07; *Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d 703, 710-11 (7th Cir. 1999); *see also Amschwand v. Spherion Corp.*, 505 F.3d 342, 347-48 (5th Cir. 2007). But Kenseth has not alleged, and there is no evidence in the record suggesting, that Dean is holding money or property that rightfully belongs to her.

Hints may be found in certain paragraphs of Kenseth's complaint suggesting that Dean was wrong in refusing to cover her Roux-en-Y procedure and attendant hospitalization, R. 8 ¶¶ 27-28, 31; but this sort of allegation will not support an award of equitable restitution. This is, in effect, an allegation that Dean erred in denying Kenseth's claim for insurance benefits. However, a denial-of-benefits claim may only be pursued under section 1132(a)(1)(B). *Varity*, 516 U.S. at 515, 116 S. Ct. at 1079; *Mondry*, 557 F.3d at 804-05. As we have noted, the absence of such a claim from Kenseth's complaint is almost certainly explained by the broad discretion that Dean enjoys in construing the terms of the Certificate, which in turn would necessitate a showing that its decision to deny Kenseth's claim was arbitrary and capricious. Notwithstanding the obstacles to relief under section 1132(a)(1)(B), Kenseth may not obtain comparable relief under the guise of a claim for breach of fiduciary duty. *See Varity*, 516 U.S. at 513-15, 116 S. Ct. at 1078-79.

The relief that Kenseth truly seems to seek is relief that is legal rather than equitable in nature. Her complaint, for example, alleges that she has suffered a pecuniary loss

and other consequential damages as a result of Dean's actions. R. 8 ¶¶ 32-33. This would be consistent with our earlier discussion of the ways in which a jury might find that Kenseth was harmed by Dean's alleged breach of fiduciary duty. *Supra* at 59-60. But this is the sort of make-whole relief that is not typically equitable in nature and is thus beyond the scope of relief that a court may award pursuant to section 1132(a)(3). *See Mertens*, 508 U.S. at 255, 113 S. Ct. at 2068; *Amschwand*, 505 F.3d at 347.

This is a matter that will have to be sorted out on re-mand. As we have noted, the parties have not briefed this issue, and it is possible, notwithstanding the narrow scope of relief available under section 1132(a)(3), that Kenseth may be able to identify a form of equitable relief that is appropriate to the facts of this case. If she cannot, then she will have failed to make out a claim on which relief may be granted, and the claim may be dismissed on that basis. *Health Cost Controls v. Skinner*, *supra*, 44 F.3d at 537-38.

Assuming that Kenseth can identify a form of equitable relief authorized by the statute, the district court shall conduct such further proceedings as are consistent with this opinion. Kenseth herself did not file a cross-motion for summary judgment, and although many if not most of the facts concerning the alleged breach of fiduciary duty appear to be undisputed and might have entitled Kenseth to at least partial summary judgment on this claim, given that Dean was never placed on notice that this was a possibility, we will leave the necessity of a trial on the merits of the claim as a second subject to be sorted out on remand.

### III.

We affirm the district court's decision to grant summary judgment to Dean on Kenseth's claims for equitable estoppel and for the purported violation of Wisconsin's limit on exclusions for preexisting conditions. However, we vacate the grant of summary judgment as to Kenseth's claim for breach of fiduciary duty and remand for a determination as to whether Kenseth is seeking any form of equitable relief that is authorized by 29 U.S.C. § 1132(a)(3) and, if so, for further proceedings on that claim as are consistent with this opinion. Kenseth shall recover her costs of appeal.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED